831 A.2d 432

**Dean James PANTAZES**

v.

**STATE of Maryland.**

**No. 142, Sept. Term, 2002.**

Court of Appeals of Maryland.

Aug. 29, 2003.

**664**

Paul Mark Sandler, Charles S. Fax (Jeffrey M. Geller, Shapiro Sheri Guinot & Sandler, on brief), Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

RAKER, J.

Dean James Pantazes, appellant, was convicted in the Circuit Court for Charles County, Maryland, of the crimes of first degree premeditated murder, first degree felony murder, second degree murder, conspiracy to commit murder, two counts of solicitation to commit murder, and use of a handgun in the commission of murder. He was indicted in Prince George's County, and the State filed a notice of intent to seek the death penalty. Pantazes exercised his constitutional and statutory right by filing a Suggestion of Removal pursuant to Article IV, § 8[1] of the Maryland Constitution and Maryland Rule 4–254(b)(1).[2] As a result, the trial was removed from Prince

---

1. Md. Const. art. IV, § 8(b) reads as follows:

"In all cases of presentments or indictments for offenses that are punishable by death, on suggestion in writing under oath of either of the parties to the proceedings that the party cannot have a fair and impartial trial in the court in which the proceedings may be pending, the court shall order and direct the record of proceedings in the presentment or indictment to be transmitted to some other court having jurisdiction in such case for trial."

2. Maryland Rule 4–254(b)(1) reads as follows:

"Capital Cases. When a defendant is charged with an offense for which the maximum penalty is death and either party files a suggestion under oath that the party cannot have a fair and impartial trial in the court in which the action is pending, the court shall order that the action be transferred for trial to another court having jurisdiction. The Circuit Administrative Judge of the court ordering removal shall designate the county to which the case is to be removed. A suggestion by a defendant shall be under the defendant's personal oath. A suggestion filed by the State shall be under the oath of the State's Attorney."

George's County to Charles County. Pantazes presents the following two issues in this appeal: did the trial court err in denying his second suggestion of removal under the Maryland Constitution, Art. IV § 8(b); and did the trial court abuse its discretion in limiting his cross-examination of Kim Young, a key witness for the State, and excluding extrinsic evidence proffered to challenge the witness' credibility. We shall answer both questions in the negative and affirm the judgments of conviction.

## I.

Appellant was tried and convicted on all counts before a jury in Charles County. Prior to sentencing, the State withdrew the notice of intent to seek the death penalty. The trial court sentenced appellant to life without the possibility of parole. He noted a timely appeal to the Court of Special Appeals. The Court of Special Appeals reversed his conviction and remanded the case for a new trial in the Circuit Court for Charles County. *Pantazes v. State*, 141 Md.App. 422, 785 A.2d 865 (2001), *cert. denied*, 368 Md. 241, 792 A.2d 1178 (2002).

On May 10, 2002, prior to the second trial, appellant filed another Suggestion of Removal. Appellant argued that because the State was no longer seeking the death penalty, the case should be transferred back to Prince George's County. Appellant also argued that media coverage of the trial had made it impossible to get an impartial jury and fair trial in Charles County. The court denied the motion, and the case proceeded to trial in the Circuit Court for Charles County on July 30, 2002.[3]

At trial, the State sought to prove that appellant hired a prostitute, Jermel Chambers, to murder his wife, Clara Pantazes. The State's key witness was Chambers. In her testimony, Chambers described the events that preceded the murder of Mrs. Pantazes. Chambers recounted that she first met

---

**3.** All future references to court proceedings will be to the second trial.

appellant in early 2000 near a 7–Eleven on Eastern Avenue, Washington, D.C., when he picked her up in his green Chevrolet Suburban. Appellant drove her to K Street and paid Chambers for sexual services. Appellant told Chambers that he would become her "regular," and they exchanged telephone numbers. Appellant met Chambers approximately twelve times, six or eight times for sexual services. During their second encounter, appellant asked Chambers about hiring her to kill someone. Appellant, who referred to himself as Steve, identified the proposed victim as his boss' wife. In early January 2000, appellant paid Chambers $5000.00 to commit the murder and promised her an additional $5000.00 for its successful completion. Chambers testified that appellant told her that he would pick her up, drive her to his boss' house and provide her with a gun, and that he instructed her to make the crime look like a robbery.

Chambers testified that the murder took place on March 30, 2000. That morning, appellant drove Chambers from the 7–Eleven on Eastern Avenue to appellant's family home in Upper Marlboro, Maryland. Appellant took Chambers into the garage and told her the gun was wrapped in a towel on top of the refrigerator. Before leaving, appellant instructed Chambers to make the murder look like a robbery by removing several valuable items from the scene. Appellant left Chambers in the garage with the door closed. When Mrs. Pantazes came into the garage, Chambers shot her three times, took her ring, watch and purse, and drove away in her car. Mrs. Pantazes died in the garage. Chambers then drove back to Washington, D.C., abandoning the car on Benning Road. Chambers eventually agreed to enter a guilty plea to murder and unlawful use of a handgun in a crime of violence and to participate in the trial against appellant in exchange for the State not seeking the death penalty.[4]

At trial, the State called Kim Young to corroborate Chambers' testimony. Young identified appellant as a person pos-

---

4. Her sentence was life imprisonment plus twenty years.

ing as "Steve." Young, also a prostitute, first met a man named Steve in December 1999 while engaging in prostitution near Paul's Liquor Store on Eastern Avenue. Young testified that, during this first sexual encounter, Steve talked about an old man he knew who needed to have "this woman" killed. Steve offered $10,000.00 to commit the murder. Young gave him a telephone number in the event he wanted another "date." At a second meeting, appellant provided Young with details of the proposed murder, stating that the garage door would be left open and that Young should come to the house between 9:00 and 9:30 a.m., when the intended victim would be leaving for work. Appellant assured Young that he would provide the gun. According to Young, Steve gave the witness a scrap of yellow paper containing his home address, directions to his house and his garage door code, providing access to the house to enable Young to find his home and to kill his wife. Appellant instructed Young to take the victim's purse, watch and car to make it look like a robbery. At various meetings over the next few months, Steve drove either his green Suburban or a Jeep Cherokee. Young did not agree to do the killing, but told Steve "I find somebody to do it for you." In response to the State's question as to whether Young ever got someone to do the murder, Young testified "No."

According to the testimony, Young learned about the murder of Mrs. Pantazes on the local television news. Recognizing the similarities between the murder and the crime proposed by Steve, Young relayed the information to a police officer. Young went to the officer, anticipating questioning by the police because Steve had called Young's residence multiple times and Young "didn't want to be involved in that mess." That evening, Young was interviewed by a Prince George's County police detective. Young gave a written statement and identified appellant as the man known as Steve.

Prior to appellant's cross-examination of Young, he moved *in limine* to inquire about, and introduce before the jury evidence of, alleged prior conduct that did not result in a conviction. The trial judge excused the jury to hear the parties' arguments. Appellant then explained his theory of

the crime—that Chambers and Young murdered Mrs. Pan-tazes during a botched robbery and that they sought to shift blame for the murder onto him. Relying on Rules 5–608(b) and 5–616(b)(2) [5] and (b)(3), appellant sought to establish Young's involvement in an incident in which Young allegedly arranged a robbery that led to murder which Young then blamed an innocent man to disguise Young's involvement. Appellant told the court that he could produce testimony to show that Young confessed to participating in the 1995 murder of a District of Columbia police officer and misidentified the killer. The trial judge arranged for a hearing on the matter the following Monday. The judge asked appellant to provide at that hearing factual support for his proffer:

"THE COURT: Well, I wanted to see something besides your mere allegations. You have three or four people.

"[DEFENSE COUNSEL]: You want us to have them with us is what you are asking? Or documentation?

"THE COURT: You have to—In other words you have to show me that there is [an] actual predicate for this testimony."

During the hearing outside the presence of the jury, appellant contended that his proposed questions regarding Young's prior misconduct were permissible under Maryland Rule 5–608(b) to impeach the witness' veracity and that extrinsic evidence was admissible under Rules 5–616(b)(2) or 616(b)(3) because it showed the witness' bias and motive to lie.

---

**5.** Appellant argued to the trial court that Rule 5–616(b)(2) permitted the court to admit the extrinsic evidence even if that evidence related only to a collateral matter. He argued that this Rule indicates that Maryland takes a more expansive view of the admissibility of extrinsic evidence than do the Federal Rules. The State, however, argued that the specific extrinsic evidence prohibition in Rule 5–608(b) trumped the more general language of Rule 5–616(b)(2). *See* J.F. Murphy, Jr., *Maryland Evidence Handbook* § 1302(c), at 504 (3d ed. 1999 & 2002 Cum.Supp.) (noting that the general rule 5–616(b)(2) "yields to the express prohibition against extrinsic 'bad act' impeachment evidence" in 5–608(b)). Appellant does not advance his 5–616(b)(2) arguments on appeal. Accordingly, we do not consider them.

In support of his motion, appellant submitted affidavits from two individuals: James Bradley, an officer assigned to investigate the 1995 incident, and Trevor Hewick, appellant's private investigator. According to defense counsel, the affidavits established that Young was engaged in prostitution with an off-duty D.C. police officer on January 12, 1995. During their encounter, Young exited the officer's vehicle and made a dancing motion, whereupon two men approached the car and attempted to rob him. When the officer resisted, he was shot and killed. Young identified Brian Hargrove as the assailant. The government filed criminal charges against Hargrove, but these charges were eventually dropped.[6] The defense argued that the affidavits provided a reasonable factual basis for asserting that Young's alleged 1995 misconduct occurred but also conceded that he expected the witness to deny any wrongdoing. Counsel told the court:

"I have the right to press hard and get an answer to questions. And if she denies it, which I expect her to. I would expect her to tell the truth, but I understand the process, and she would probably not tell the truth. And then we need to prove this through extrinsic evidence."

The State argued that the affidavits did not constitute a reasonable basis for questions about the 1995 incident. The trial judge disallowed questions about the 1995 incident and excluded the extrinsic evidence, stating that there was no basis for the questions and that there were "no reasonable allegations that Young had any bias, prejudice, or motive to testify falsely in this case."

Later, during Young's cross-examination, defense counsel posed questions about the witness' involvement in the murder of Mrs. Pantazes as follows:

"Q: Isn't it true that you were involved in Mrs. Pantazes' death?

"A: No.

---

6. In May 1995, while Hargrove's case, No. F438–95, was pending in the Superior Court of the District of Columbia, the prosecution dismissed the charges against Hargrove. *See* Affidavits of Bradley and Hewick.

"Q: Isn't it true, ma'am, that you conspired with Jermel Chambers to burglarize the Pantazes home?

"A: No.

"Q: You had the directions to his home, correct?

"A: Correct.

"Q: And you even had the garage code, correct?

"A: Correct.

"Q: It wouldn't be beyond you to plan to burglarize or rob somebody, would it?

"A: No.

"Q: It would or would not be beyond you?

"A: No, it wouldn't. I wouldn't do that.

"Q: I am sorry?

"A: I would not do that.

"Q: You don't do that?

"A: No.

"Q: You don't plan robberies of people?

"A: No.

"Q: You don't plan burglaries of people?

"A: No.

"Q: And you wouldn't frame someone? You wouldn't do that?

"A: No.

"Q: And you wouldn't set anyone up at all? You just wouldn't do that?

"A: No."

Appellant then renewed his motion to question Young about the 1995 incident and to introduce extrinsic evidence. The trial judge again denied the motion, stating: "I have already ruled. I don't think the basis for the questions and the cross examination is sufficient." The trial continued, and the jury convicted appellant on all counts. The court sentenced him to life without the possibility of parole on the murder count.

Appellant noted a timely appeal to the Court of Special Appeals. This Court granted certiorari prior to consideration by that court to consider the removal and evidentiary issues. *See Pantazes v. State,* 374 Md. 81, 821 A.2d 369 (2003). We

affirm and hold that the trial court correctly denied the Suggestion of Removal and did not abuse its discretion in limiting the cross-examination and impeachment evidence.

## II

■ We first address appellant's removal argument. Before this Court, appellant argues that the Circuit Court erred by denying his second Suggestion of Removal. Appellant argues that, in non-capital cases, the Maryland Constitution guarantees a defendant the right to be tried in his home jurisdiction absent an evidentiary showing that he or she would be unable to procure a fair and impartial jury in that jurisdiction. He argues that he has been deprived of this right because the trial court denied his suggestion of removal back to his home county—Prince George's County. He states that "removal of the possibility of imposition of the death penalty ... should cause the parties and the case to revert to *status quo ante*," in this instance, Prince George's County. He maintains that any other result would grant the State greater power than a defendant, in violation of state and federal due process and equal protection guarantees, and would allow prosecutors to abuse the system by forcing removal without genuinely intending to seek the death penalty.

The State contends that the trial court properly denied appellant's removal motion because, once the trial court granted appellant's initial Suggestion of Removal, the action proceeded as if originally filed in the Circuit Court for Charles County. Under no circumstances was appellant entitled to a removal back to Prince George's County. Removal to any other locale could be granted only upon a showing, under Maryland Rule 4–254(b)(2), that he could not receive a fair and impartial trial in Charles County. Appellant does not argue that he can meet that standard.

■ Article IV, § 8 of the Maryland Constitution provides for the removal of cases. Section 8(b) governs removal for offenses punishable by death and reads as follows:

"In all cases of presentments or indictments for offenses that are punishable by death, on suggestion in writing under

oath of either of the parties to the proceedings that the party cannot have a fair and impartial trial in the court in which the proceedings may be pending, the court shall order and direct the record of proceedings in the presentment or indictment to be transmitted to some other court having jurisdiction in such case for trial."

The right of removal for cases punishable by death is automatic, but neither party is *required* to exercise the right. *See Redman v. State,* 363 Md. 298, 313, 768 A.2d 656, 664 (2001). A party may exercise the automatic removal right only once. *See Johnson v. State,* 303 Md. 487, 506, 495 A.2d 1, 10 (1985). We have explained the exercise of the right as follows:

"[W]here a defendant in a criminal case is subject to the death penalty, his [or her] right to remove a case is, in the first instance, absolute. *Johnson v. State,* 258 Md. 597, 600–01, 267 A.2d 152, 154 (1970). Further removal, we have stated, requires the party seeking the change to make a showing that there were reasonable grounds to believe he could not secure a fair trial. *Id. See also, Veney v. State,* 251 Md. 182, 191, 246 A.2d 568, 573 (1968), *cert. denied,* 394 U.S. 948, 89 S.Ct. 1284, 22 L.Ed.2d 482 (1969) ('the absolute right of removal can be exercised only once'); *Lee v. State,* 164 Md. 550, 552, 165 A. 614, 615, *cert. denied,* 290 U.S. 639, 54 S.Ct. 56, 78 L.Ed. 555 (1933) (and cases cited therein) ('the right [of removal] had been and can only be exercised once')."

*Id.,* 495 A.2d at 10.

▪ Although the right of removal is automatic in capital cases, it is discretionary in all other non-capital cases and in civil cases. *See* Md. Const. art. IV, § 8(c); *Redman,* 363 at 305 n. 7, 768 A.2d at 660 n. 7. Article IV, § 8(c) provides as follows:

"In all other cases of presentment or indictment, and in all suits or actions at law or issues from the Orphans' Court pending in any of the courts of law in this State which have jurisdiction over the cause or case, in addition to the suggestion in writing of either of the parties to the cause or case

that the party cannot have a fair and impartial trial in the court in which the cause or case may be pending, it shall be necessary for the party making the suggestion to make it satisfactorily appear to the court that the suggestion is true, or that there is reasonable ground for the same; and thereupon the court shall order and direct the record of the proceedings in the cause or case to be transmitted to some other court, having jurisdiction in the cause or case, for trial. The right of removal also shall exist on suggestion in a cause or case in which all the judges of the court may be disqualified under the provisions of this Constitution to sit. The court to which the record of proceedings in such suit or action, issue, presentment or indictment is transmitted, shall hear and determine that cause or case in the same manner as if it had been originally instituted in that Court. The General Assembly shall modify the existing law as may be necessary to regulate and give force to this provision."

In a non-capital case, the party seeking removal bears the burden of showing that a fair and impartial trial cannot be obtained. *See* Md. Const. art. IV, § 8(c). Whether a case should be removed is a decision that rests within the sound discretion of the trial court. *Shreffler v. Morris*, 262 Md. 161, 165, 277 A.2d 62, 64 (1971).

The power of the court to grant a change of venue has been recognized as a critical means of promoting justice and fairness by eliminating local prejudices. *See Heslop v. State*, 202 Md. 123, 126, 95 A.2d 880, 881 (1953). The *Heslop* Court noted that the right of removal has been considered so essential to the administration of justice that it has been incorporated into the organic law of Maryland for two centuries. *See id.*, 95 A.2d at 881. In *Redman*, we summarized the history detailed in *Heslop*:

"In January 1805, the Legislature passed an Act proposing an Amendment to the Constitution of 1776 that, *inter alia*, gave courts discretion to remove criminal cases where any party suggested in writing that a fair and impartial trial could not be had in the court in which the case was pending. The Act was later confirmed, and a discretionary right of

removal in all criminal cases became part of the Maryland Constitution. The Constitutional Convention of 1851 revised this provision by eliminating the discretionary aspect and gave the right of removal to the defendant in every criminal case. Reports of gross abuse of the unlimited removal right led the Constitutional Convention of 1864 to return the power of removal to the court's discretion, and the Constitution was amended to so provide. The rule was again changed by the Constitutional Convention of 1867, removing once more the court's discretion and making the right automatic. In 1874, the Legislature, again hearing reports of abuse of the unlimited removal right, proposed an Amendment to the 1867 Constitution to provide automatic removal only in those cases where the crime was punishable by death. This Amendment was ratified by the Maryland voters in 1875. . . ."

*Redman,* 363 Md. at 306–07, 768 A.2d at 660–61 (citations and footnote omitted). The right reached its current form following the 1874 constitutional amendment ratified by Maryland voters in 1875.

The varying breadth of the right of removal in Maryland history demonstrates a "shifting concern between having a broad right of removal and having a very limited right because of the abuse associated with requests for removal." *Johnson v. State,* 271 Md. 189, 194, 315 A.2d 524, 527–28 (1974). The present language, arising from a desire to narrow the right and to curb the abuse resulting from numerous removal requests, authorizes automatic removal only in criminal cases where the penalty may be death. *See Redman,* 363 Md. at 307, 768 A.2d at 661; *Johnson,* 303 Md. at 506, 495 A.2d at 10.

To be sure, in this State, a criminal trial must be held in the county (or in Baltimore City) in which the crime was committed unless the defendant requests a change of venue. The short answer to appellant's argument that he had the right to be tried in his home jurisdiction is that he was never denied that right—he was indicted in Prince George's County, his home county, and would have been tried there but for his request to have the case removed from that county.

■ Once a party exercises the right of removal, "further removal" requires a showing that there are reasonable grounds to believe that the party could not receive a fair and impartial trial. *See* Md. Const. art.IV, § 8(c); Md. Rule 4–254(b)(2). The Constitution provides that upon removal, the "court to which the record of proceedings in such suit or action, issue, presentment or indictment is transmitted, shall hear and determine that cause or case in the same manner as if it had been originally instituted in that court." Md. Const. art.IV, § 8(c). Appellant exercised his right of automatic removal and, in doing so, venue for the trial was proper in the Circuit Court for Charles County, not in the Circuit Court for Prince George's County. The case then properly proceeded as if it had been instituted originally in Charles County.

■ Once a case is removed properly from one jurisdiction, a *nolle prosequi* or reversal and remand for a new trial does not reinvest jurisdiction in the transferor court. In *Smith v. State*, 31 Md.App. 106, 112, 355 A.2d 527, 531 (1976), the Court of Special Appeals cogently noted as follows:

> "As a general rule, the effect of a change of venue in a criminal case is to remove the cause absolutely from the jurisdiction of the court granting the change, except for curing irregularities or omissions in the record. Further, the court to which the indictment has been transferred is not divested of jurisdiction by dismissal, nolle prosequi or mistrial, and it retains exclusive jurisdiction to try the case after a new indictment for the same offense has been returned."

The court held that, once a defendant removed a case, the place of venue became proper in the new county for the original indictment and for all subsequent indictments. *Id.* at 112–13, 355 A.2d at 531–32; *cf. Vogel v. Grant,* 300 Md. 690, 698 n. 6, 481 A.2d 186, 190 n. 6 (1984) (noting that "where a party in the District Court is entitled to a jury trial, demands a jury trial thereby vesting jurisdiction in the circuit court, and thereafter some event occurs which, if it had occurred earlier while the case had been in the District Court, would

have rendered the case inappropriate for a jury trial . . . . the circuit court should not remand the case to the District Court; instead the circuit court's jurisdiction over the case continues").

■ In the instant case, after the initial removal, venue was proper in Charles County, not Prince George's. The State's withdrawal of intent to seek the death penalty did not reinvest jurisdiction in the Circuit Court for Prince George's County. There is nothing pending in the Circuit Court for Prince George's County, and to gain additional removal, appellant was required to demonstrate that he could not receive a fair and impartial trial in Charles County. As a result of the change of venue, the Circuit Court for Charles County is vested with complete control and authority over the criminal case and its jurisdiction is not destroyed by the withdrawal of the death notice by the State. The dismissal of the death notice cannot reinvest jurisdiction in the Circuit Court for Prince George's County because, by appellant's exercise of his automatic right of removal and the subsequent change of venue, that court was divested of its jurisdiction. Appellant was outside the constitutional automatic removal provision and solely within the discretionary provision requiring that he establish that he could not receive a fair and impartial trial in Charles County. Even if he had met that burden, which he does not contend that he did, the right of removal does not include the right to choose the new venue. Choice of venue lies within the sound discretion of the trial court. *See Lee v. State*, 161 Md. 430, 441–43, 157 A. 723, 727–28 (1931). In both capital and non-capital cases, Rule 4–254 provides that "[t]he Circuit Administrative Judge of the court ordering removal shall designate the county to which the case is to be removed." We hold that the trial court did not abuse its discretion in denying appellant's motion for further removal.

### III.

#### A. Maryland Rule 5–608(b)

■ We next consider whether the trial court properly limited the cross-examination of Kim Young. Appellant relies

primarily on Rule 5–608(b) as support for his argument that the trial court erred in denying his motion *in limine* to question Young about the 1995 incident. That Rule provides as follows:

> **"Impeachment by examination regarding witness's own prior conduct not resulting in convictions.** The court may permit any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness. Upon objection, however, the court may permit the inquiry only if the questioner, outside the hearing of the jury, establishes a reasonable factual basis for asserting that the conduct of the witness occurred. The conduct may not be proved by extrinsic evidence."

Appellant contends that the trial court improperly limited his cross-examination of Young because the questions were relevant to the character trait for truth and veracity and because he provided, through affidavits, a reasonable factual basis that the alleged conduct occurred.

The State argues that the trial court properly precluded the inquiry into the 1995 incident because appellant did not satisfy the reasonable factual basis requirement of Rule 5–608(b). The State maintains that appellant's affidavits did not establish Young's involvement in the 1995 robbery or that Young intentionally misidentified the killer. Appellant did not, the State argues, establish a reasonable factual basis that Young's conduct actually occurred.

During a hearing outside the presence of the jury, appellant sought to question the State's witness, Kim Young, about a 1995 incident in which the witness allegedly participated in a robbery that led to murder and blamed the murder on an innocent man to cover any involvement. The trial court denied the motion because appellant had not met his burden to show that there was a reasonable factual basis that the alleged misconduct occurred. We conclude that the trial court did not abuse its discretion by limiting cross-examination in the absence of a reasonable factual basis for the alleged misconduct.

 The Confrontation Clause of the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee a criminal defendant the right to confront the witnesses against him or her. *See Merzbacher v. State,* 346 Md. 391, 411–12, 697 A.2d 432, 442 (1997). Central to that right is the opportunity to cross-examine witnesses. One of the most effective means of attacking the credibility of a witness is through cross-examination. *See Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (noting that "[c]ross examination is the principal means by which the believability of a witness and the truth of his testimony are tested"). Thus, the defendant's right to cross-examine witnesses includes the right to impeach credibility, to establish bias, interest or expose a motive to testify falsely. *See, e.g., Marshall v. State,* 346 Md. 186, 192, 695 A.2d 184, 187 (1997); *Ebb v. State,* 341 Md. 578, 587, 671 A.2d 974, 978 (1996). It has long been recognized that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis,* 415 U.S. at 316–17, 94 S.Ct. at 1110.

 Nevertheless, a defendant's constitutional right to cross-examine witnesses is not boundless. The Confrontation Clause does not prevent a trial judge from imposing limits on cross-examination. *See Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Ebb,* 341 Md. at 587, 671 A.2d at 978. Judges have wide latitude to establish reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. *See Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435, 89 L.Ed.2d 674; *see Merzbacher,* 346 Md. at 413, 697 A.2d at 443 (noting that the Court has "said on numerous occasions that trial courts retain wide latitude in determining what evidence is material and relevant, and to that end, may limit, in their discretion, the extent to which a witness may be cross-examined for the

purpose of showing bias"). The Supreme Court has observed as follows:

"A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. A defendant's interest in presenting such evidence may thus 'bow to accommodate other legitimate interests in the criminal trial process.' As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused."

*United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 1264, 140 L.Ed.2d 413 (1998) (citations and footnote omitted).

The scope of cross-examination lies within the sound discretion of the trial court. *See Walker v. State,* 373 Md. 360, 394, 818 A.2d 1078, 1098 (2003); *Ebb,* 341 Md. at 587, 671 A.2d at 978; *Robinson v. State,* 298 Md. 193, 201, 468 A.2d 328, 332 (1983). This discretion is exercised by balancing "the probative value of an inquiry against the unfair prejudice that might inure to the witness. Otherwise, the inquiry can reduce itself to a discussion of collateral matters which will obscure the issue and lead to the fact finder's confusion." *State v. Cox,* 298 Md. 173, 178, 468 A.2d 319, 321 (1983); *see Ebb,* 341 Md. at 588, 671 A.2d at 979 (noting that a trial judge must balance the probative value of proposed evidence against the potential for undue prejudice, "keeping in mind the possibility of embarrassment to or harassment of the witness and the possibility of undue delay or confusion of the issues"). An undue restriction of the fundamental right of cross-examination may violate a defendant's right to confrontation. Whether there has been an abuse of discretion depends on the particular circumstances of each individual case. *See Ebb,* 341 Md. at 587–88, 671 A.2d at 978. On appellate review, we determine whether the trial judge imposed limitations upon cross-examination that inhib-

ited the ability of the defendant to receive a fair trial. *See Merzbacher,* 346 Md. at 413, 697 A.2d at 443; *see also Small-wood v. State,* 320 Md. 300, 307, 577 A.2d 356, 359 (1990) (noting that a trial court should not limit cross-examination until a defendant has reached the constitutionally required threshold level of inquiry).

Rule 5–608(b) represents an exception to the general prohibition, embodied in Rule 5–404,[7] against using evidence of character to show propensity. *See* P.W. Grimm, *Impeachment and Rehabilitation Under the Maryland Rules of Evidence: An Attorney's Guide,* 24 U. Balt. L.Rev. 95, 117 (1994). Rule 5–608(b), by its plain language, permits any witness to be cross-examined about his or her prior acts not evidenced by a criminal conviction that are probative of untruthfulness. *See* Md. Rule 5–608(b); *see also* A.D. Hornstein,

---

7. Maryland Rule 5–404, **Character evidence not admissible to prove conduct; exceptions; other crimes,** reads as follows:

"(a) Character evidence generally. (1) In general. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

"(A) Character of accused. Evidence of a pertinent trait of character of an accused offered by the accused, or by the prosecution to rebut the same;

"(B) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

"(C) Character of witness. Evidence of the character of a witness with regard to credibility, as provided in Rules 5–607, 5–608, and 5–609.

"(2) Definitions. For purposes of subsections (a)(1)(A) and (B) of this Rule, 'accused' means a defendant in a criminal case and a child alleged to be delinquent in an action in juvenile court, and for purposes of subsection (a)(1)(B), 'crime' includes a delinquent act as defined by Code, Courts Article, § 3–801.

"(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident."

*The New Maryland Rules of Evidence: Survey, Analysis and Critique*, 54 Md. L.Rev. 1032, 1057–58 (1995). Upon objection, however, the proponent of the inquiry must establish a "reasonable factual basis" that the alleged conduct occurred. If the inquiry is permitted, a party is bound by the witness' response because, according to the Rule, the conduct may not be proved by extrinsic evidence. This limitation is a safeguard intended to avoid dangers such as undue consumption of trial time, confusion of the issues, and unfair surprise. *See* J.W. Strong, *McCormick on Evidence,* § 41, at 155–56 (5th ed. 1999 & 2003 Supp.); 3A J.H. Wigmore, *Evidence,* § 979, at 826–27 (Chadbourn rev.1970). Even evidence that falls within the guidelines of 5–608(b) may be excluded pursuant to Rule 5–403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[8] Md. Rule 5–403; *see* 6 L. McLain, *Maryland Evidence,* § 608.1, at 477 (2d ed. 2001 & 2002 Supp.).

Rule 5–608(b) codified the common law rule and this Court's holdings in *State v. Cox,* 298 Md. 173, 468 A.2d 319 (1983) and *Rau v. State,* 133 Md. 613, 105 A. 867 (1919) (holding that defendant may not offer extrinsic evidence to support allegations of past false accusations). *See Merzbacher,* 346 Md. at 419, 697 A.2d at 446; 125th Report of the Court of Appeals of Maryland Standing Committee on Rules of Practice and Procedure 119 (July 1993) (on file with Committee). In *Cox,* the defendant was convicted of rape in the first degree, a sexual offense in the first degree and common law assault. *Cox v. State,* 51 Md.App. 271, 273, 443 A.2d 607, 609 (1982). Cox's defense at trial was that he was not the

---

8. Rule 5–403, **Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time,** provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

assailant. *Cox,* 298 Md. at 176, 468 A.2d at 320. The victim's identification of Cox as the perpetrator constituted the only direct evidence linking him to the crime. *Id.* at 177, 468 A.2d at 321. During cross-examination of the victim, Cox sought to establish that she was lying by questioning her about an alleged prior false accusation of an incident in which, under oath, she allegedly charged another person with criminal assault and recanted the charge during cross-examination. *Id.,* 468 A.2d at 321. The trial court precluded the defendant from pursuing this line of questioning. *Id.* at 177–78, 468 A.2d at 321. We held that the trial court committed reversible error in limiting the cross-examination. *Id.* at 184–85, 468 A.2d at 324–25. We reasoned that a witness may be cross-examined about prior bad acts which are relevant to the witness' credibility, subject to the following limitations:

"[S]uch inquiry [may] be conducted *when the trial judge is satisfied that there is a reasonable basis for the question,* that the primary purpose of the inquiry is not to harass or embarrass the witness, and that there is little likelihood of obscuring the issue on trial. We recognize that in cases regarding prior misconduct, the cross-examiner is bound by the witness' answer and, upon the witness' denial, may not introduce extrinsic evidence to contradict the witness or prove the discrediting act. The witness is not disadvantaged because there is nothing for him [or her] to rebut. Thus, the inquiry virtually stops with the question and answer, except to the extent that the trial judge may allow further cross-examination to refresh the witness' recollection.

"We have also been steadfast in holding that mere accusations of crime or misconduct may not be used to impeach. The rationale for this viewpoint is obvious. First of all, accusations of misconduct are still clothed with the presumption of innocence and receiving mere accusations for this purpose would be tantamount to accepting someone else's assertion of the witness' guilt and pure hearsay."

*Id.* at 179–80, 468 A.2d at 321–22 (emphasis added) (citations omitted); *see also* 3A J.H. Wigmore, *supra,* § 980a, at 835–36.

We also noted that, when a party is attempting to impeach a witness in this regard, the relevant inquiry is "not whether the witness has been accused of misconduct by some other person, but whether the witness *actually committed* the prior bad act." *Id.* at 181, 468 A.2d at 323 (emphasis added).

In *Robinson v. State*, 298 Md. 193, 468 A.2d 328 (1983), another foundation for Rule 5–608(b)'s reasonable factual basis language, we again emphasized that inquiries into prior acts of witnesses are evaluated rigorously. Robinson was tried for murder and other offenses related to the killing of a woman during a burglary of her home. A key witness for the State had admitted to committing several burglaries and was a long-term resident of a mental hospital. Prior to his cross-examination, defense counsel sought to impeach the witness' credibility by inquiring into his conduct at the mental hospital, including an attack on a fellow patient and three incidents of arson. The trial court precluded any inquiry into these incidents, remarking that they "do not appear to be relevant." Id. at 196, 468 A.2d at 330. On appeal, this Court reiterated that a witness may be cross-examined about prior bad acts that are relevant to assessing credibility. *Id.* at 197, 468 A.2d at 331. We highlighted, however, the difference between impeachment by cross-examination regarding prior conviction on the one hand and prior misconduct not resulting in conviction on the other. We noted:

> "Because a conviction of a crime conclusively establishes the underlying misconduct, counsel may inquire into any final conviction which suggests that the witness is unworthy of belief. However, if the bad acts are not conclusively demonstrated by a conviction, the trial judge must exercise greater care in determining the proper scope of cross-examination."

*Id.* at 200, 468 A.2d at 332. This Court remarked that a groundless inquiry into prior misconduct would be prejudicial, noting that "only prior bad acts which are very closely related to the witness' veracity and for which counsel can demonstrate a *firm basis* for believing that the conduct in fact occurred would pass the trial judge's scrutiny." *Id.* at 201, 468 A.2d at

332–33 (emphasis added). We held that the trial court did not abuse its discretion in concluding that the incidents at the mental hospital were not relevant and could not be used to impeach the State's witness. *Id.* at 198, 468 A.2d at 331.

In *Merzbacher v. State*, 346 Md. 391, 697 A.2d 432 (1997), we addressed another limitation incorporated into Rule 5–608(b)—the extrinsic evidence prohibition. Merzbacher, a school teacher, was indicted and convicted of common law rape, sexual child abuse and other charges stemming from alleged long-term sexual abuse of a female student. On appeal, Merzbacher argued, *inter alia*, that the trial court erred by excluding testimonial evidence from a school official as to whether the victim had reported alleged acts of sexual misconduct by other persons. He maintained that he should have been allowed to show the victim's proclivity for accusing people of sexual misconduct and that her accusations were not credible. *Id.* at 417, 697 A.2d at 445. This Court noted as follows:

> "Merzbacher attempted to impeach [the victim's] credibility through the introduction of highly speculative and unproven extrinsic testimony suggestive of her tendency to make such accusations. Merzbacher failed to produce evidence of a complaint made by [the victim] other than that made against Merzbacher, much less one that was false."

*Id.* at 418, 697 A.2d at 445. We reasoned that "Merzbacher was not entitled to introduce extrinsic testimony to support his attempted exploration of [the victim's] character through prior bad acts evidence." *Id.* at 419, 697 A.2d at 446. We held that, pursuant to Rule 5–608(b), the trial court did not err or abuse its discretion in excluding the official's extrinsic testimony. *Id.* at 419–20, 697 A.2d at 446.

In sum, the right to cross-examine witnesses regarding the witness' own prior conduct not resulting in a criminal conviction is limited by Rule 5–608(b) in several ways. First, the trial judge must find that the conduct is relevant, *i.e.*, probative of untruthfulness. Second, upon objection, the court must hold a hearing outside the presence of the jury, and the

questioner must establish a reasonable factual basis for asserting that the conduct of the witness occurred. Third, the questioner is bound by the witness' answer and may not introduce extrinsic evidence of the asserted conduct. Finally, as with all evidence, the court has the discretion to limit the examination, under Rule 5–403, if the court finds that the probative value of the evidence is outweighed by unfair prejudice. *See* 6 L. McLain, *supra*, § 608:1, at 477 (noting that a court may utilize its discretion under Maryland Rules 5–403 and 5–611(a) to exclude evidence that meets the requirements of Rule 5–608(b)); *see also United States v. Flaharty*, 295 F.3d 182, 191 (2d Cir.2002) (discussing that under Federal Rule of Evidence 608(b), the court may restrict cross-examination about specific instances of prior conduct if it finds that the conduct is not probative of truthfulness and further, under Federal Rule 403, that the court may exclude even relevant evidence if it finds that the probative value of the testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence).

Rule 5–608(b) provides no specific guidance as to what constitutes "a reasonable factual basis," and this Court has not addressed its meaning in any depth, although the *Cox* Court indicated that a "hearsay accusation of guilt" was not sufficient. 298 Md. at 181, 468 A.2d at 323. Many courts that have considered this requirement, or a similar one, have concluded that its purpose is to ensure that the questions are propounded in *good faith* and are not aimed to put before the jury unfairly prejudicial and unfounded information supported only by unreliable rumors or innuendo. *See, e.g., United States v. Simonelli*, 237 F.3d 19, 23 (1st Cir.2001); *United States v. Ovalle–Marquez*, 36 F.3d 212, 218–19 (1st Cir.1994); *State v. Pratt*, 759 P.2d 676, 681–85 (Colo.1988); *State v. Chance*, 236 Conn. 31, 671 A.2d 323, 338 (1996); *People v. Alamo*, 23 N.Y.2d 630, 298 N.Y.S.2d 681, 246 N.E.2d 496, 497 (1969); *State v. Nesbit*, 978 S.W.2d 872, 882 (Tenn.1998) (stating that "reasonable factual basis" requirement of eviden-

tiary rule requires that questions be proposed in good faith); *State v. Wyrick,* 62 S.W.3d 751, 781 (Tenn.Crim.App.2001).

It was within the trial court's discretion to determine whether appellant established a reasonable factual basis for asserting that Young's alleged conduct occurred and to limit reasonably appellant's cross-examination regarding the 1995 incident. In our view, the trial court correctly satisfied the requirements of the Rule and did not abuse its discretion in concluding that Pantazes failed to establish a reasonable factual basis that the asserted conduct of the witness occurred. In order to determine whether there is a reasonable basis for the contention that the witness made a similar prior allegation, the trial court properly held a hearing outside of the presence of the jury. We conclude that the trial court's determination that there was an insufficient factual basis that the alleged conduct occurred was justified.

As we have indicated, this issue arose prior to the cross-examination of Kim Young. Insisting that the evidence amounted to a "common scheme," a theory later abandoned, defense counsel proffered that he would produce several witnesses to testify about the 1995 incident. Based on counsel's proffer, the trial court remarked that counsel might "have struck some gold," but reserved ruling on the issue because the court wanted to see "something besides ... mere allegations." The judge then said: "In other words you have to show me that there is [an] actual predicate for this testimony."

The next court day, appellant produced two affidavits and argued that the affidavits established that Young was involved in the robbery-turned-murder and that Young lied in identifying Brian Hargrove as the killer. The affidavit of investigating officer James Bradley read, in part, as follows:

"7. Kevin Young, upon being discovered by the police, gave a statement identifying Brian Hargrove as the shooter of [the officer].

"8. Thereafter, Mr. Hargrove was arrested and charged with the murder in the District of Columbia. His arrest

and charges were based upon the information supplied by Kevin Young to the police.

"9. That same day, Detective Susan Blue of the Metropolitan Police Department, Homicide Division, received an anonymous call that Mr. Hargrove was not the person who was responsible for the murder of [the officer].

"10. Based on this information that I received from Kevin Young that Mr. Hargrove was the shooter, I obtained an arrest warrant for Mr. Hargrove.

"11. The warrant was executed on or about January 14, 1995.

"12. Mr. Hargrove remained in the court system until May 1995, when his criminal charges [were] dismissed by the Government. Billy Ponds represented Mr. Hargrove."

The second affidavit, signed by private investigator Trevor Hewick, read in pertinent part as follows:

"7. Kevin Young, upon being discovered by the police, gave a statement identifying Brian Hargrove as the shooter of [the officer].

8. Thereafter, Mr. Hargrove was arrested and charged with the murder. His arrest and charges were based upon the information supplied by Kevin Young to the police.

9. That same day, Detective Susan Blue of the Metropolitan Police Department, Homicide Division, received an anonymous call that Mr. Hargrove was not the person who was responsible for the murder of [the officer]. I interviewed Detective Blue on August 1, 2002, wherein she supplied this information to me.

"10. Thereafter, two individuals who were actually involved in the robbery and murder were identified.

"11. The detective in charge of the case was Detective James Bradley. Based on the information he received from Kevin Young that Hargrove was the shooter, he obtained an arrest warrant for Mr. Hargrove.

"12. The warrant was executed on January 14, 1995. That same day the anonymous call was received that Hargrove

was not the correct person to be arrested, and also the information supplied suggested where the authorities could look to find the actual shooter.

"13. Mr. Hargrove remained in the court system until May 1995, when his criminal charges were dropped. Billy Ponds represented Mr. Hargrove.

"14. I also spoke to Billy Ponds, who verified the fact that Brian Hargrove had been falsely accused of the murder."

The Bradley affidavit does not establish that Young lied in identifying Hargrove nor does it say that Young "set up" the robbery. Appellant never indicated to the trial court that he could present any competent evidence to establish that Young had set up the robbery and falsely accused another of a crime. That the charges were dismissed by the Government does not alone establish that Young lied. *See, e.g., State v. Anderson,* 211 Mont. 272, 686 P.2d 193, 200, 201 (1984) (finding that the offered evidence would not have been probative of veracity, the court noted that "[t]here was no competent evidence that the [witness' previous allegations] were false. That the charges were dismissed does not by itself establish their falsity"). This is especially so in light of the prosecutor's proffer that he had spoken with Detective Bradley and the federal prosecutor who had handled the 1995 case. The State's Attorney proffered to the court that the federal prosecutor, who was in Maine but was willing to come to testify, said that "she believed [Young]. She said they just didn't have enough evidence, anything to go forward with. No corroboration. No gun. No [sic] anything recovered. And she said Bradley wanted to go forward. Bradley said [Young] did not have anything to do with the murder."

The Hewick affidavit does not fare any better. This affidavit also does not establish that Young was involved with the botched robbery or that Young lied about an identification. It contains no facts to support an allegation that Young lied when identifying Hargrove as the killer. Hewick's statement that Hargrove's attorney, Billy Ponds, "verified" that Hargrove had been "falsely accused" of murder is nothing more

than a bald conclusion. *See Anderson,* 686 P.2d at 200 (noting that "a mere denial does not establish falsity" and that the testimony of an attorney that his client denied an accusation of sexual assault "would have been inadmissible hearsay").

The evidence appellant sought to introduce would not have been probative of Young's character trait for untruthfulness. With no factual support, appellant's proffer of evidence amounted to little more than mere accusations that Young was involved in the 1995 robbery and lied about the identity of the killer. The *Cox* Court emphasized "that when impeachment is the aim, the relevant inquiry is not whether the witness has been accused of misconduct by some other person, but whether the witness actually committed the prior bad act. A hearsay accusation of guilt has little logical relevance to the witness' credibility." 298 Md. at 181, 468 A.2d at 323; *see also* 3A J.H. Wigmore, *supra,* § 980a, at 835–36 (observing that "[i]t should be understood by all courts that the only relevant circumstance is actual conduct, i.e., the fact, not the mere charge, of having misbehaved"). Accordingly, we hold that the trial court did not abuse its discretion in precluding cross-examination about the 1995 incident.

### B. Maryland Rule 5–616(b)(3)

At trial, appellant apparently realized that in order to avoid the exclusionary mandate of Rule 5–608(b), he needed to fit the proffered extrinsic evidence within Rule 5–616(b). Rule 5–616(b)(3) reads as follows:

> "Extrinsic evidence of bias, prejudice, interest, or other motive to testify falsely may be admitted whether or not the witness has been examined about the impeaching fact and has failed to admit it."

The trial court refused to admit the extrinsic evidence under Rule 5–616(b)(3) because there were "no reasonable allegations" of bias or motive to lie. The trial court concluded that the evidence proffered by appellant related, only marginally, to Young's character for truth and veracity, not to any bias or motive to lie in the case.

Appellant contends before this Court that he was entitled to present extrinsic evidence of the 1995 incident pursuant to Rule 5–616(b)(3). He argues that the trial court erred in excluding his proffered extrinsic evidence because the evidence, while relevant to Young's character for truth and veracity, was relevant also to bias or motive to testify falsely. The evidence, he argues, demonstrates that Young had the capacity to plan robberies and falsely accuse others to hide involvement in the crime.

The State argues that the trial court properly excluded extrinsic evidence regarding the 1995 incident. The State maintains that appellant's extrinsic evidence does not serve as evidence of bias or motive to testify falsely; therefore, Rule 5–608(b)'s restriction on extrinsic evidence is applicable. Moreover, the State argues, even if the evidence falls within the scope of 5–616(b)(3), its potential for unfair prejudice and confusion of the issues far exceeds its probative value.

We hold that the trial court did not err in excluding extrinsic evidence of the 1995 incident based on Rule 5–616. The extrinsic evidence, at best, related to Young's character trait for truth and veracity and did not provide evidence of bias or motive to lie in the instant case.

It is well established that the bias, hostility or motives of a witness are relevant and proper subjects for impeachment. *See, e.g., Smith v. State,* 371 Md. 496, 504, 810 A.2d 449, 454 (2002); *Ebb,* 341 Md. at 587–88, 671 A.2d at 978–79. Bias describes "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984). Bias includes "[p]rejudice against the plaintiff, partiality towards the defendant, or an interest in the litigation...." J.F. Murphy, Jr., *Maryland Evidence Handbook* § 1302(E)(1) (3d ed. 1999 & 2002 Cum.Supp.); *see* 3A J.H. Wigmore, *supra,* § 949 (noting that the range of circumstances from which bias may be inferred is "infinite" but generalizing that an intimate family relationship, an employ-

ment relationship, the pendency of civil litigation between witness and party, a pending charge against a witness, and the witness' occupation are commonly relevant to bias). A motive to lie or testify falsely is also included in the notion of bias. *See Ford v. United States,* 549 A.2d 1124, 1125 n. 2 (D.C.1988). Proof of bias may be used to attack a witness' veracity or the reliability of his or her testimony. *See* J.F. Murphy, Jr., *supra,* § 1302(E)(1).

In the case *sub judice,* appellant makes no cogent argument as to how the proposed extrinsic testimony establishes bias or motive to lie. He sought to impeach Young with specific instances of conduct—allegedly lying about involvement in the 1995 robbery-turned-murder and purposely misidentifying the killer—and argued that this misconduct established the witness' propensity to lie. The alleged misconduct does not establish that the witness has a bias or motive to lie in this particular case. It does not uncover prejudice against appellant, partiality towards the State, or an interest in this litigation. The trial court properly categorized the evidence of the 1995 incident as falling under Rule 5–608(b) rather than Rule 5–616(b)(3). What appellant was trying to establish with extrinsic evidence was in reality an effort to present propensity evidence, or behavior in conformity with a character trait to lie, not evidence of motive or bias. As we have indicated, he came up short under Rule 5–608(b), and he is not rescued by Rule 5–616(b)(3).

Moreover, we observe that the trial court permitted the defense a full opportunity to expose Young's potential bias and motive to lie. On cross-examination, defense counsel questioned Young about financial compensation received from the State for providing evidence and testifying at trial, about the witness' pending charge for prostitution, about the witness' relationship with Chambers and the witness' alleged involvement in the murder of Mrs. Pantazes, and about whether the witness reported information to the police to cast suspicion onto appellant.

*JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.*