895 A.2d 339

**Saturio Grogrieo FIELDS**

v.

**STATE of Maryland.**

**No. 311, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

March 30, 2006.

Michael R. Malloy (Nancy S. Forster, Public Defender, on the brief), Baltimore, for appellant.

**26**

Devy Patterson Russell (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Panel: SALMON, KENNEY and DEBORAH S. EYLER, JJ.

DEBORAH S. EYLER, J.

In an unreported opinion filed on May 25, 2005, a panel of this Court affirmed the judgments of the Circuit Court for Prince George's County convicting Saturio Grogrieo Fields, the appellant, of first-degree murder and two counts of first-degree assault. *Fields v. State,* No. 311 Sept.Term 2004, 162 Md.App. 767 (Eyler, D., J.).

The appellant had raised five issues for review on appeal. In issue one, he contended that the trial court had erred in admitting evidence that his nickname, "Sat Dogg," was projected on a television monitor in the bowling alley where the crimes occurred. He argued that the evidence was hearsay and that it was not admissible under any exception to the hearsay rule. We rejected that argument, holding that the evidence was admissible non-hearsay. We also rejected the appellant's other four issues.

The appellant filed a petition for writ of *certiorari,* which was granted by the Court of Appeals. *Fields v. State,* 390 Md. 513, 889 A.2d 1025 (2006).

On December 8, 2005, the Court of Appeals filed its opinion in *Bernadyn v. State,* 390 Md. 1, 887 A.2d 602 (2005). Then, by order of January 11, 2006, it vacated the decision of this Court in the case at bar, with directions that we reconsider it in light of *Bernadyn.* The *Bernadyn* case is pertinent to the appellant's first issue, but not to the other issues he raised.

We have reconsidered our decision in light of the Court of Appeals' decision in *Bernadyn,* and shall affirm the judgments of the circuit court. Because we are publishing this opinion,

we shall set forth in full our discussion of all the appellant's issues.[1]

## FACTS AND PROCEEDINGS

The appellant's convictions stem from the shootings of three young men at a bowling alley in Clinton, Maryland, shortly after midnight on May 17, 2003. The three men were among a group of about 15 employees of a nearby supermarket who were enjoying a night out at the bowling alley. Tyneal Bussey was killed by a gunshot wound to the chest. Early Eborn was shot in the abdomen and Rozier Davis was shot in the arm.

The appellant was charged with numerous crimes arising out of the shootings, including first-degree murder of Bussey. He was tried by a jury in the Circuit Court for Prince George's County.

The State's evidence showed that, while at the bowling alley on the night in question, the appellant became involved in a dispute with Bussey and asked Bussey to step outside. The appellant exited the bowling alley and went outside to the parking lot as Bussey changed out of his bowling shoes, took off his shirt, and headed for the doorway. Several other supermarket employees followed Bussey, believing there was going to be a fight.

A crowd gathered by the doorway of the bowling alley. Several witnesses testified that a white car was parked outside, and that the appellant was standing beside the car, holding a rifle. When Bussey reached the doorway, the appellant opened fire, killing Bussey and injuring Davis and Eborn. All three victims were still inside the bowling alley when they were struck by gunfire.

Two members of the supermarket group identified the appellant as the shooter from a photographic array. They also identified him in court. There was evidence that the

---

1. The discussion of issues two through five is the same as that which appeared in our unreported opinion, with some minor stylistic changes.

shooter was wearing a white t-shirt and jeans, and that the appellant had been wearing clothes of that description the day before the shooting.

There also was evidence introduced by the State that the appellant went by the nickname "Sat Dogg."

The appellant's primary theory of defense was that he was not the shooter and was not even present at the bowling alley when the shootings happened.

The jury convicted the appellant of first-degree murder of Bussey and two counts of first-degree assault, one each for Davis and Eborn. The court imposed a prison sentence of life without the possibility of parole for the murder conviction. It imposed 20–year sentences, to run consecutive to the life sentence, for each assault conviction.

The appellant raised the following questions on appeal, which we have rephrased:

I. Did the trial court err by admitting hearsay evidence that the appellant was present at the bowling alley when the crimes were committed?

II. Did the trial court err by refusing to permit defense counsel to cross-examine a key prosecution witness about a prior inconsistent statement?

III. Did the trial court err by refusing to permit the defense to call a witness who would have testified about a key prosecution witness's bias against, and motive to lie about, the appellant?

IV. Did the trial court apply an incorrect legal standard in deciding the appellant's motion for new trial?

V. Was the evidence insufficient to support the first-degree murder conviction?

We shall include additional facts as necessary to our discussion of the issues.

## DISCUSSION

### I.

#### (a)

Detective Ismael Canales, a member of the homicide unit of the Prince George's County Police Department, was among the officers who responded to a report of shootings at the bowling alley. Once inside, he observed that there was a television monitor at each bowling lane, and the names and scores of the bowlers at that lane were displayed on the screen.

The detective asked one of the bowling alley employees whether the information displayed on the television screens could be printed out. He was told that that could not be done because the bowling alley did not have an operating printer. Upon learning that, Detective Canales proceeded to make a handwritten list, itemizing each bowling lane and the names displayed on the screen for that lane.

Detective Canales listed 32 bowling lanes. Lanes 1 through 15 were empty, as were lanes 20, 27, and 31. The empty lanes were not in use and no names appeared on their monitors. Detective Canales recorded the names on the screen above lane 22 as "Sat Dogg/Bleu/Vino."

Immediately before the start of trial, the defense moved *in limine* to preclude the State from eliciting testimony from Detective Canales that the name "Sat Dogg" appeared on a television screen in the bowling alley or introducing into evidence the detective's handwritten list showing that the name "Sat Dogg" appeared on the television screen at bowling lane 22. Defense counsel argued that the evidence was hearsay. Specifically, she maintained that the name "Sat Dogg" on the screen was an implied assertion, by an unknown declarant, made out of court, that the appellant was present in the bowling alley that night; and the State was offering the implied assertion in evidence to show its truth. Because the evidence did not fall within any exception to the rule against hearsay, it was inadmissible.

The court provisionally denied the motion, commenting that there was no reason to think the person who typed the appellant's nickname onto the television screen above bowling lane 22 intended that act as an assertion that the appellant was present at that location.

On direct examination of Detective Canales, defense counsel objected when the prosecutor asked foundational questions about the detective's handwritten list (which had been marked as State's Exhibit 23). Defense counsel explained that she was again raising a hearsay objection.[2] The prosecutor responded that "this evidence is being offered to show what names were on the screens as observed by Detective Canales when on the scene."

The trial court overruled the objection and allowed questioning to proceed. Over further objections, Detective Canales testified that he saw the names that were displayed on the television screens at the bowling lanes and wrote State's Exhibit 23 to document the names he saw, as there was no printer available. Also over objection, State's Exhibit 23 was moved into evidence.

Several witnesses testified, also over defense objections, that the names and scores of the bowlers in a particular lane were projected on the television screen at that lane during the game. The manager of the bowling alley testified that a name could be entered and displayed on a particular television screen by typing it either on a keypad located at the bowling lane below the monitor or on a keypad located at the bowling alley control desk.

Melody Holmes, who was dating the appellant at the time of the crimes, testified that, in the early morning hours soon after the shootings, the appellant came to her house and talked on his cell phone to a person he called "Vino." She also testified that the appellant was wearing bowling shoes.

---

2. The defense did not object to the admission of Detective Canales's list on any ground other than hearsay.

In closing argument, the prosecutor made two references to the evidence that "Sat Dogg's" name was displayed on one of the television screens. First, in recounting Detective Canales's testimony about what he did upon arriving at the bowling alley the night of the shootings, the prosecutor said:

And Detective Canales, the lead investigator, that was his job to find out who did it, put it together. When he came there, there is no evidence introduced at all that he knew anything, who Saturio Fields was, who Sat Dogg was. No evidence at all. But what did he do? They talked to witnesses. They collected items of evidence that were found at the scene. Shell casings out front, the weather, the shoes, no video unfortunately. He checked that.

And what did he do? He was smart. He wrote down the names from all the screens. And when he did that, he just did it out of instinct, but he did it. He did this all with the hope, with the idea that he could—the system could bring someone to justice, to hold them accountable for these terrible acts, these terrible shootings.

Second, the prosecutor included the name-on-the-screen evidence in his review of items found at the crime scene that tended to show that the appellant was there. The prosecutor itemized that evidence for the jury: a sweater found at the bowling alley that later was determined to have the appellant's DNA on it; shell casings linked to a gun that a witness testified was found under the appellant's bed; and a white car with decals that met the description of the car the appellant drove. The prosecutor then added:

What about the name on the television monitor? Connection to the crime scene. There was testimony about how it got there, how the names get up there. And we know the Defendant has a nickname Sat Dogg. We know it. How do we know it? [A witness] said so. We have the tattoo on [the appellant's] arm to show it. Where was the name Sat Dogg? Lane 22.

32

**(b)**

■ Under Maryland common law, an utterance or other act would be deemed hearsay if an assertion, however attenuated, could be implied from the utterance or act. *See generally* 6A Lynn McLain, *Maryland Evidence* § 801:4 (2001). *See, e.g., Waters v. Waters,* 35 Md. 531, 544–45 (1872) (adopting rule of law established by *Wright v. Tatham,* 7 Adolphus & E. 313, 112 Eng. Rep. 488 (King's Bench 1837), *aff'd,* 5 Cl. & F. 670 (House of Lords 1838), that letters to decedent were inadmissible hearsay in suit challenging decedent's testamentary capacity because letters contained implied assertion that decedent was competent to respond); *Eiland v. State,* 92 Md.App. 56, 79–82, 607 A.2d 42 (1992) (explaining that shooting victim's recitation of Lord's prayer and exhortation to witnesses to convey his love to his family were implied assertions that victim was dying and were therefore hearsay, although they were admissible under exceptions to hearsay rule), *rev'd on other grounds sub nom. Tyler v. State,* 330 Md. 261, 623 A.2d 648 (1993).

In 1994, the Court of Appeals adopted the Maryland Rules of Evidence, including Chapter 800, entitled "Hearsay." Rule 5–801 sets forth the definitions that apply to that chapter. It provides:

(a) **Statement.** A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.

(b) **Declarant.** A "declarant" is a person who makes a statement.

(c) **Hearsay.** "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

The Committee Note to Rule 5–801 points out:

This Rule does not attempt to define "assertion," a concept best left to development in the case law. The fact that proffered evidence is in the form of a question or something other than a narrative statement, however, does not neces-

sarily preclude its being an assertion. The Rule also does not attempt to define when an assertion, such as a verbal act, is offered for something other than its truth.

In *Stoddard v. State*, 389 Md. 681, 887 A.2d 564 (2005), the Court of Appeals held that a declarant of words that imply a factual proposition need not intend for the words to imply that proposition for the words to be an "assertion," within the meaning of Rule 5–801(a). The Court rejected the intent-of-the-declarant approach to implied assertions under the hearsay rule, and instead retained the common law approach.

Stoddard was convicted of second-degree murder and child abuse resulting in death. The victim was his girlfriend's three-year-old son. The child died of multiple blunt-force injuries. Stoddard was babysitting the victim and the victim's 18–month–old cousin when the victim sustained the fatal injuries. The State called as a witness the mother of the 18–month–old cousin. Over defense counsel's objection, the mother was permitted to testify that the child had asked her, in a frightened voice, "Is [Stoddard] going to get me?" *Id.* at 683, 887 A.2d 564.

The Court of Appeals held that the child's words implied that Stoddard was the person who had killed the victim, and thus constituted an "assertion," regardless of whether the child intended to convey the factual proposition they implied. The Court explained:

> We conclude that ... out-of-court words offered for the truth of unintentional implications are not different substantially from out-of-court words offered for the truth of intentional communications. The declarant's lack of intent to communicate the implied proposition does not increase the reliability of the declarant's words in a degree sufficient to justify exemption from the hearsay rule. Said another way, we conclude that a declarant's lack of intent to communicate a belief in the truth of a particular proposition is irrelevant to the determination of whether the words are hearsay when offered to prove the truth of that proposition.

We hold that where the probative value of words, as offered, depends on the declarant having communicated a factual proposition, the words constitute an "assertion" of that proposition. The declarant's intent *vel non* to communicate the proposition is irrelevant. If the words are uttered out of court, then offered in court to prove the truth of the proposition—*i.e.* of the "matter asserted"—they are hearsay under our rules.

389 Md. at 703–04, 887 A.2d 564.

The Court of Appeals filed its opinion in *Bernadyn, supra,* the same day that it filed its opinion in *Stoddard.* Bernadyn was convicted of various drug offenses after a search warrant was executed on a residence. At trial, he maintained that he did not live at the targeted residence. To prove that Bernadyn did in fact live there, the State offered into evidence a medical bill from Bayview Physicians that was seized at the residence during the execution of the search warrant. Bernadyn's name and the address of the residence were written on the bill. The evidence was admitted over Bernadyn's objection that it was hearsay—an out-of-court implied assertion that he lived at the targeted residence, offered for its truth— that did not fall within an exception to the rule against hearsay.

The Court of Appeals reversed, holding that the bill indeed was inadmissible hearsay evidence. The Court reasoned that the State was offering the bill into evidence to show that Bernadyn lived at the address on the bill. The bill thus was being used as an implied assertion that Bernadyn lived at the address on the bill, and therefore was hearsay. (The parties agreed that, if the bill was hearsay, it was not admissible.) The Court explained:

In order to accept the words "Michael Bernadyn, Jr., 2024 Morgan Street, Edgewood, Maryland 21040" as proof that Bernadyn lived at that address, the jury needed to reach two conclusions. It needed to conclude, first, that Bayview Physicians wrote those words because it believed Bernadyn to live at that address, and second, that Bayview Physicians

was accurate in that belief. As used, the probative value of the words depended on Bayview Physicians having communicated the proposition that Michael Bernadyn lived at 2024 Morgan Street. The words therefore constituted a "written assertion"—and hence, under Md. Rule 5–801(a), a "statement"—that Michael Bernadyn lived at 2024 Morgan Street. When used to prove the truth of that assertion, the bill was hearsay under Md. Rule 5–801(c), because it contained "a statement . . . offered in evidence to prove the truth of the matter asserted."

*Bernadyn, supra,* 390 Md. at 11, 887 A.2d 602 (footnotes omitted).

The Court remarked that, at trial, the State did not offer the bill merely as an item of circumstantial evidence:

The bill contained two significant items: Bernadyn's name, and his address. The State did not argue simply that an item bearing Bernadyn's name was found in the house and that Bernadyn probably resided at the house. Rather, the State argued that the bill itself was "a piece of evidence that shows who lives there." In particular, the State suggested that Bayview Physicians had Bernadyn's correct address because "any institution is going to make sure they have the right address when they want to get paid."

390 Md. at 11, 887 A.2d 602. In a footnote, the Court added, "The words [on the bill] would not be probative as offered if it could be established that Bayview Physicians *did not believe* Bernadyn to live at 2024 Morgan Street, *e.g.,* if it believed that Bernadyn received his mail there but lived elsewhere." *Id.* at n. 4 (emphasis in original).

### (c)

Returning to the instant case, the reason the trial judge gave for concluding that the evidence that the appellant's nickname was on a television screen in the bowling alley was non-hearsay was incorrect, under *Stoddard.* The trial judge determined that the person who entered the name "Sat Dogg" on the screen did not intend to assert that the appellant

was present in the bowling alley. If the words "Sat Dogg" were an implied assertion of the factual proposition that the appellant was present in the bowling alley at the time of the shootings, it would make no difference whether the "declarant" of the words intended to convey that factual proposition. *Stoddard, supra,* 389 Md. at 703–04, 887 A.2d 564.

That error does not matter, however, if for another reason the evidence in question was not hearsay. We consider *de novo* whether evidence is hearsay, because that is a pure question of law. *Bernadyn, supra,* 390 Md. at 8, 887 A.2d 602 (stating that "a circuit court has no discretion to admit hearsay in the absence of a provision providing for its admissibility," and that "[w]hether evidence is hearsay is an issue of law reviewed *de novo*").

The core question here is whether the evidence that the appellant's nickname was on a television screen at bowling lane 22 constituted an implied assertion that the appellant was present in the bowling alley that night, and was offered by the State to show his presence; or whether it was an item of circumstantial crime scene evidence from which reasonable jurors could infer that the appellant was present in the bowling alley that night.

In *Bernadyn, supra,* the Court drew that distinction, and in doing so focused on how and for what purpose the proponent of the evidence (the State) was using it. The Court emphasized that the State in that case did not offer the medical bill merely to show that it was a thing found at the crime scene—a fact from which the jurors could infer that Bernadyn probably lived there. Rather, it offered the item as proof that Bernadyn lived at the residence by showing that Bayview Hospital, an outsider, believed that he lived there, was accurate in that belief, and acted on that belief. The prosecutor in *Bernadyn* "argued that the bill itself was 'a piece of evidence that shows who live[d]' " at the residence and "suggested that Bayview Physicians had Bernadyn's correct address because 'any institution is going to make sure that they have the right address when they want to get paid.' " 390 Md. at 11, 887 A.2d 602

(quoting from record in that case). The State was using the bill to show that its author, who would have reason to know Bernadyn's address, sent it there, impliedly asserting that Bernadyn lived there.

In the case at bar, we conclude that the evidence that the appellant's nickname was found on a television screen in the bowling alley on the night of the shootings falls into the category of non-assertive circumstantial crime scene evidence.

The State called Detective Canales and questioned him about what he found at the bowling alley when he responded to the call of a shooting and what evidence he collected at the scene. Detective Canales testified that he saw names on the screens at the bowling lanes and wrote all of them down on a piece of paper. The prosecutor argued that the appellant's nickname, "Sat Dogg," on the screen at lane 22 was one of several items of evidence at the crime scene that linked the appellant to the scene—including a sweater with his DNA on it, casings from a gun that was under his bed, and a car that looked like his car.

The prosecutor did not attempt to use the evidence of the words "Sat Dogg" on the screen at the bowling alley to show that a known declarant believed the appellant was present there, had reason to accurately hold that belief, and therefore was impliedly asserting that factual proposition by entering his nickname on the screen. Unlike the probative value of the medical bill in *Bernadyn, supra,* the probative value of the evidence that the appellant's name was on the television screen did not depend upon the belief of the person who typed the name on the screen, or upon the accuracy of that person's belief. The prosecutor did not argue that the person who entered the name "Sat Dogg" on the screen only would have done so if he or she believed that the appellant was present in the bowling alley. Indeed, there was no evidence about that person's belief, because the person was not identified. The prosecutor argued only that the crime scene included a bowling lane with the name "Sat Dogg" written above it.

38

To be sure, the probative value of the name-on-the-screen evidence was that it had a tendency to show that the appellant was a bowler at the bowling alley that night, and therefore was present at the location of the shootings. Any item at the crime scene that could be connected to the appellant in some way, regardless of the veracity of its source, also would have that probative value. The jurors could have drawn the same inference that the appellant was present at the bowling alley from the evidence that the sweater with his DNA on it was found there.

The appellant's name on the television screen in the bowling alley was not an implied assertion of the factual proposition that the appellant was present at the bowling alley, although it was circumstantial evidence that could be probative of that fact. Because the evidence was not an "assertion," under Rule 5–801(a), it was not a "statement" under that subsection and hence was not hearsay under Rule 5–801(c). It was admissible non-hearsay evidence. Accordingly, the trial court's evidentiary ruling was not in error.

## II.

Melody Holmes was a key witness for the State, as her testimony implicated the appellant in the shootings. The appellant argues on appeal that the trial court committed reversible error by precluding defense counsel from cross-examining Holmes about a prior inconsistent statement that she allegedly made to a reporter for a local television news program.

Holmes testified that, at about 3:00 a.m. on May 17, 2003, the appellant arrived at her apartment carrying a gun, which he placed under her bed. He was talking on a cell phone when he arrived, and she heard him tell the person with whom he was speaking that he had been involved in an altercation at the bowling alley and had punched someone in the throat.

The next day, Holmes called the police and reported what she had heard. She gave the police permission to search her

apartment, and they recovered a gun from under the bed.[3] Holmes added that she told the police she was afraid of the appellant, so they paid for her to stay at a hotel for four nights. Nevertheless, Holmes telephoned the appellant multiple times from the hotel. Holmes admitted that she met with the appellant when she left the hotel and stayed with him for several days. Eventually, she went with the appellant to the police station when he turned himself in.

On cross-examination, Holmes admitted that she visited two lawyers with the appellant. Defense counsel attempted, with limited success, to question Holmes as to whether she told the two lawyers that she did *not* overhear the appellant saying anything that would link him to the bowling alley shootings and that, in fact, he did *not* come to her home after the shootings took place. Defense counsel also questioned Holmes as to whether she made a statement exculpating the appellant to a reporter for a local television news program, but the court sustained the State's objection to that line of questioning.

On re-direct examination, the prosecutor clarified some of what defense counsel had sought to elicit from Holmes during cross-examination. Upon questioning by the prosecutor, Holmes explained that, at the appellant's direction, she told the lawyers that the appellant "was never in [her] house, he was at his mother's house on the night that everything happened, and that he don't know nothing about what had happened." Holmes indicated that the appellant had exhorted her three times to relate that version of events, and that she did so because she was afraid of him.

Under Rule 5–616(a)(1), "[t]he credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at . . . [p]roving under Rule 5–613 that the witness has made statements that are inconsistent

---

**3.** A firearms examiner for the Prince George's County Police testified that two shell casings recovered from the bowling alley after the shootings were fired from the rifle recovered from beneath Holmes's bed.

with the witness's present testimony." Rule 5–613, in turn, provides:

(a) **Examining witness concerning prior statement.** A party examining a witness about a prior written or oral statement made by the witness need not show it to the witness or disclose its contents at that time, provided that before the end of the examination (1) the statement, if written, is disclosed to the witness and the parties, or if the statement is oral, the contents of the statement and circumstances under which it was made, including the persons to whom it was made, are disclosed to the witness and (2) the witness is given an opportunity to explain or deny it.

(b) **Extrinsic evidence of prior inconsistent statement of witness.** Unless the interests of justice otherwise require, extrinsic evidence of a prior inconsistent statement by a witness is not admissible under this Rule (1) until the requirements of section (a) have been met and the witness has failed to admit having made the statement and (2) unless the statement concerns a non-collateral matter.

The appellant posits that, in light of these rules, defense counsel should have been permitted to cross-examine Holmes about her statement to the television news reporter and, in the event Holmes denied making the statement, should have been permitted to call other witnesses who had seen the news report.

■ As the Court of Appeals has summarized, a trial court has broad discretion in determining the scope of cross-examination, and we will not disturb the exercise of that discretion in the absence of clear abuse. Nonetheless, the discretion is not unlimited, and "a cross-examiner must be given wide latitude in attempting to establish a witness' bias or motivation to testify falsely." The appropriate test to determine abuse of discretion in limiting cross-examination is whether under the particular circumstances of the case, the limitation inhibited the ability of the defendant to receive a fair trial. In assessing whether the trial court abused its discretion in limiting the cross-examination of [an] attorney who wished to show bias or motive to fabri-

cate, we look to see whether the jury had sufficient information to make a discriminating assessment of the particular witness's possible motives for testifying falsely in favor of the State.

*Martin v. State*, 364 Md. 692, 698, 775 A.2d 385 (2001) (internal citations omitted). "Judges have wide latitude to establish reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Pantazes v. State*, 376 Md. 661, 680, 831 A.2d 432 (2003).

We detect no abuse of discretion in the instant case. As we have indicated, Holmes testified to the effect that the appellant had urged her on three occasions to deny that he had implicated himself in the shootings and to deny that he had visited her apartment after the shootings took place. Holmes readily admitted that she repeated the false information supplied by the appellant. By way of explanation, she made clear that she had been dating the appellant at the time of the incident, and also that she was afraid of him.

In light of Holmes's admission that she lied at the appellant's direction, the identities of the persons to whom she lied was of little discernible consequence. The trial court properly curtailed cross-examination on the subject. *Cf. Ali v. State*, 314 Md. 295, 307, 550 A.2d 925 (1988) (trial court properly exercised its discretion by excluding police report containing prior inconsistent statement of witness where police officer had already recounted witness's statement and written report would have been unnecessary and cumulative), *abrogated on other grounds by Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993). There was ample evidence before the jury to permit the jury "to make a discriminating assessment of [Holmes's] possible motives for testifying falsely in favor of the State." *Martin, supra*, 364 Md. at 698–99, 775 A.2d 385.

## III.

On cross-examination of Melody Holmes, defense counsel inquired as to whether she ever was romantically involved

with a man by the name of Terry Brock. Holmes denied any such involvement. The appellant asserts that, if defense counsel had been permitted to call potential witness Carlos Butler to the stand, Butler would have testified that, at the time of the shootings, Terry Brock was interested in Holmes, and the two became romantically involved shortly after the shootings. The appellant maintains that Butler's testimony would have established that Holmes had "a powerful motive to falsely accuse" him. That is, she "wanted to get rid of him so that she could take up with Mr. Brock."

The record regarding the appellant's argument is somewhat deficient, in that there is no clear ruling on the record prohibiting defense counsel from calling Butler. After the State presented its case against the appellant, defense counsel told the court that Butler was one of the witnesses she intended to call. Counsel proffered:

I want to call him to get testimony in pursuant to the 5–616(b), extrinsic evidence of other motive to testify falsely and bias.

Now, what he is going to say, Carlos Butler is going to say that he knows Terry Brock, Melody Holmes, and Saturio Fields and that Terry Brock had the hots for Melody from way back, but that their romantic relationship blossomed at about the time of the shooting. . . .

The court interrupted counsel to send the jury to lunch, then indicated to counsel that it would discuss with them off the record the scheduling of the defense witnesses.

When court resumed after the lunch recess, defense counsel made no attempt to call Brock to the stand. Later, after the jury retired to deliberate, defense counsel addressed the court as follows:

Your Honor, may I address the Court with a proffer? I did not object on the record at lunch time. I was hoping I could put it on the record now.

. . .

THE COURT: Go ahead.

[DEFENSE COUNSEL]: We had a witness named Carlos Butler who was present here in court whose testimony I would argue is admissible under 5–616(b), extrinsic evidence and bias.

Mr. Butler is a friend of both Saturio Fields, Terry Brock and Melody Holmes. He would testify that Terry Brock and Melody Holmes are in a romantic relationship. That prior to the shooting, Mr. Brock had a romantic interest in Melody Holmes. After the shooting, the romantic relationship came to fruition, and those are the reasons why I would call Carlos Butler.

Defense counsel went on to proffer the content of testimony she would have elicited from several other witnesses had she been permitted to call them. The prosecutor responded: "Rulings have been made, arguments have been made on these issues, Your Honor. I don't have anything more to add. . . . It's all extrinsic. Just whatever we said earlier, Your Honor." The court then reaffirmed its earlier decisions, apparently made off the record, denying the defense's request to call various proposed witnesses. In doing so, the court did not specifically mention Butler.

Although there is no specific ruling on the record regarding Butler's testimony, we shall assume without deciding that the court ruled that Butler's testimony was inadmissible. *See generally Prout v. State,* 311 Md. 348, 357, 535 A.2d 445 (1988) (explaining that when a trial court rules to exclude evidence the proponent of the evidence need not attempt to offer the evidence in order to preserve the matter for appellate review). We are satisfied that such a ruling by the trial court would have reflected a proper exercise of discretion.

The appellant contends that the trial court erred by refusing to permit defense counsel to present extrinsic evidence in order to impeach the testimony of Melody Holmes.

Rule 5–616(b)(3) provides:

Extrinsic evidence of bias, prejudice, interest, or other motive to testify falsely may be admitted whether or not the

witness has been examined about the impeaching fact and has failed to admit it.

Impeachment evidence will not be permitted, however, if it pertains to " 'collateral matters which will obscure the issue and lead to the fact finder's confusion.' " *Pantazes, supra,* 376 Md. at 681, 831 A.2d 432 (citation omitted) (regarding impeachment through cross-examination). A party seeking the admission of impeachment evidence is obligated to establish the relevance of the evidence. *Cf. Blair v. State,* 130 Md.App. 571, 596, 747 A.2d 702 (2000) (regarding admissibility of statement offered under Md. Rule 5–616(c)(2) to rehabilitate witness).

Assuming without deciding that the question was before the trial court, we conclude that the court properly barred defense counsel from calling Butler to the stand. The record reflects that defense counsel told the court at the close of the State's case that she wanted to elicit from Butler testimony that "Terry Brock had the hots for Melody from way back, but that their romantic relationship blossomed at about the time of the shooting." After the jury retired to deliberate, counsel reminded the court that "prior to the shooting, Mr. Brock had a romantic interest in Melody Holmes. After the shooting, the romantic relationship came to fruition[.]" Obviously, Butler's testimony would have impeached Holmes's testimony that she had never been involved with Brock. Neither Holmes's nor Brock's love life after the shootings, however, had any apparent relevance to the murder and assault charges against the appellant. Butler's testimony thus appeared to address only a collateral matter.

Nothing in the record suggests that defense counsel ever informed the court that Butler's testimony would establish that Holmes had a motive to falsify. The appellant's argument that the testimony would establish that Holmes "wanted to get rid of him so she could take up with Mr. Brock"— apparently made for the first time on appeal—is, at best, farfetched.

## IV.

■ More than a month after the verdicts were returned against the appellant, he moved for a new trial on the ground of newly discovered evidence. *See* Md. Rule 4–331(c). The motion was heard at the start of the sentencing hearing.

At the hearing, the defense presented evidence that, after trial, the appellant met a prisoner named Ivan Rollins at the Prince George's County Detention Center. Rollins was awaiting trial for murder. He had been at the bowling alley when the shootings occurred but had informed the investigating officers that he had not seen anything. Rollins testified at the hearing, however, that he had seen the shooter. He stated that after meeting the appellant he realized that the wrong man had been convicted and "didn't want to see an innocent person" take the rap. Rollins then came forward with what he knew.

Defense counsel argued that Rollins's testimony was newly discovered evidence that "may well have produced a different result" had it been presented at trial. The State pointed out that Rollins himself was not newly discovered, in that he had been questioned by police at the scene of the crime and had denied having any knowledge regarding the identify of the shooter. The State contended that the "new story" Rollins was telling was not newly discovered either, in that defense counsel could have attempted to interview Rollins prior to trial and discovered the evidence by doing so. The State concluded that, even if Rollins's story was newly discovered evidence, Rollins's credibility was so suspect that there "wasn't any substantial or significant possibility that the verdict would have been affected by his testimony."

The court denied the motion for new trial. The appellant argues that, in doing so, the court applied the wrong standard. He points to a comment made by the trial judge that, in order to warrant a new trial, newly discovered evidence must be of such a nature that it "will probably produce an acquittal." The Court of Appeals has stated:

We favor ... a standard that falls between "probable," which is less demanding than "beyond a reasonable doubt," and "might" which is less stringent than probable. We think that a workable standard is: The newly discovered evidence may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected.

*Yorke v. State,* 315 Md. 578, 588, 556 A.2d 230 (1989).

▆▆▆ Upon reviewing the record of the hearing on the motion for a new trial as a whole, we are satisfied that the trial court applied the proper standard. As we have indicated, both defense counsel and the prosecutor set forth the proper standard prior to the court's ruling. The court itself indicated that it was well aware of the case law on the subject and the "areas of inquiry" for analyzing newly discovered evidence. "[J]udges are presumed to know, and properly to have applied, the law[.]" *Davis v. State,* 344 Md. 331, 339, 686 A.2d 1083 (1996).

Before denying the motion for new trial, the trial judge opined:

Its [sic] clear to me after listening to this testimony that this witness ... obviously lied to the police when initially interviewed and ... didn't come forward until after the fact. And [if called at trial] ... would be questioned about his involvement in a murder case, which would have been pending at the time of this trial ... so it would have been open for the State to inquire. And even if [Rollins] took the Fifth Amendment on that issue they will bring in the same witness that I heard today who was one of the investigating officers ... who will testify how he flip flopped on the story. But, more importantly, ... it was an overwhelmingly strong case against the defendant. *This testimony wouldn't have made a bit of difference as far as I'm concerned.* So I'm going to deny the motion.

(Emphasis added.) Although the trial court may have misspoken when it commented that, in order to warrant a new trial newly discovered evidence must be of such a nature that it

"will probably produce an acquittal," it subsequently made clear that it believed that, no matter how lenient the standard, Rollins's testimony would not have affected the verdicts.

## V.

Finally, the appellant contends that the evidence was insufficient to support the first-degree murder conviction in that it failed to establish that the shooting of Bussey was premeditated. He asserts that the State's evidence established only that "the shooting was the rash and impetuous result of an argument."

"A person may be convicted of first degree premeditated murder upon evidence legally sufficient to establish that the person perpetrated a willful, deliberate, and premeditated killing." *Wagner v. State*, 160 Md.App. 531, 564, 864 A.2d 1037 (2005). "[T]o be 'premeditated' the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate. It is unnecessary that the deliberation or premeditation shall have existed for any particular length of time.'" *Id.* (citation omitted). "If the killing results from a choice made as a consequence of thought, no matter how short the period between the intention and the act, the crime is characterized as deliberate and premeditated." *Id.* at 565, 864 A.2d 1037.

As we indicated in our recitation of the facts, the State presented evidence that the appellant became involved in an altercation with Bussey inside the bowling alley and asked Bussey to step outside. The appellant left the building first and went to the parking lot. He retrieved a gun from his car and, when Bussey reached the doorway of the building, opened fire, striking Bussey and two bystanders. While the evidence did indeed suggest that "the shooting was the rash and impetuous result of an argument," it also established to the jury's satisfaction that the appellant made a conscious choice to kill, preceded by an appreciable length of time.

" 'The standard for appellate review of evidentiary sufficiency is whether, after viewing the evidence in the light

most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *State v. Suddith,* 379 Md. 425, 429, 842 A.2d 716 (2004) (citation omitted). *See generally Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). On the record before us, we are satisfied that a reasonable jury could have found beyond a reasonable doubt that the murder of Bussey was premeditated.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.**

Dissenting Opinion by KENNEY, J.

Having reconsidered the hearsay issue in this case in light of the Court of Appeals decision in *Bernadyn v. State,* 390 Md. 1, 887 A.2d 602 (2005), the majority has concluded that Detective Canales's handwritten list showing that the name "Sat Dogg" appeared on the television screen at bowling lane 22 is not hearsay. That conclusion is reached by treating the evidence as an item of circumstantial crime evidence from which reasonable jurors could infer that the appellant was present in the bowling alley on the night of the shooting. In other words, the evidence is merely "non-assertive circumstantial crime scene evidence" like the "sweater with [appellant's] DNA on it, casings from a gun that were under [appellant's] bed, and a car that looked like [appellant's] car." Maj. op. at 37, 895 A.2d at 348. In light of *Bernadyn,* I am persuaded that the evidence is hearsay and, therefore, I must respectfully dissent.

Evidence must be evaluated in the context of what is sought to be proved. Here, the State seeks to prove that appellant was the person who shot Bussey, Davis, and Eborn at a bowling alley on the night in question. Appellant denies that he did and that he was even present at the bowling alley on that night. In its determination, the majority relies heavily on the prosecutor's response to appellant's objection that "this evidence is being offered to show what names were on the screens as observed by Detective Canales when on the scene." Clearly, the only name on any of the screens that is of any

consequence in the context of this trial is the name "Sat Dogg," appellant's somewhat unusual nickname. Its presence on the lane 22 screen has little, if any, relevance except as an implied assertion that someone known as "Sat Dogg" was bowling on lane 22 on the night in question. But, even assuming that the evidence might be properly introduced for the limited purpose of demonstrating what names Detective Canales observed on the screen, there is no indication that the admission was limited to that purpose or that the trial court saw any need to do so. *Bernadyn*, 390 Md. at 15, 887 A.2d 602. The trial court admitted the evidence based on its understanding that the evidence did not constitute hearsay because it was not intended as an assertion. That understanding, which was not necessarily limited to the trial court, was rendered incorrect by *Stoddard v. State*, 389 Md. 681, 887 A.2d 564 (2005).

That the "prosecutor argued only that the crime scene included a bowling lane with the name 'Sat Dogg' written above it," Majority Opinion at 37, 895 A.2d at 348, is belied by the prosecutor's argument. The purpose of the evidence, and I would suggest only relevance, is apparent in the State's closing argument. After acknowledging that, when Detective Canales arrived at the scene he did not know anything about "who Saturio Fields was, who Sat Dogg was," the prosecutor argued: "What about the name on the television monitor? Connection to the crime scene. There was testimony about how it got there, how the names got up there. And we know that the Defendant has a nickname Sat Dogg. We know it. How do we know it? [a witness] said so. We have the tattoo on [the appellant's] arm to show it. Where was the name Sat Dogg? Lane 22."

*Stoddard* and *Bernadyn* lead me to conclude that the evidence at issue cannot be treated merely as circumstantial evidence from which a fact finder might conclude that appellant was present at the bowling alley on the night of the incident, a fact that appellant denies. The shell casings, the sweater, and the vehicle, which point to appellant (but possibly could have been present at the scene as a result of the actions

of a third person), are evidentiary dots that were connected by other evidence. On the other hand, the name "Sat Dogg" on the television monitor, standing alone, has no purpose except to assert that appellant was obviously present and bowling on Lane 22 on the night in question. Its probative value is dependent on an unknown scribe's belief that one of the bowlers on lane 22 was "Sat Dogg," and the accuracy of that belief.