81 A.3d 600

**Matthew Derek CORRELL**

v.

**STATE of Maryland.**

No. 1358, Sept. Term, 2012.

Court of Special Appeals of Maryland.

Dec. 19, 2013.

Brian P. Kelly (Buckley, Sandler, LLP, Washington, DC and Paul B. DeWolfe, Public Defender, Baltimore, MD), all on the brief, for appellant.

Todd W. Hesel (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: DEBORAH S. EYLER, BERGER, and JAMES P. SALMON (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

A jury in the Circuit Court for Charles County convicted Matthew Derek Correll, the appellant, of first-degree murder (both premeditated and felony murder), second-degree murder, attempted robbery with a dangerous and deadly weapon, conspiracy to commit robbery with a dangerous and deadly weapon, and two counts of use of a handgun in the commission of a crime of violence. The court sentenced the appellant to life in prison without parole and three consecutive sentences of twenty years each.

The appellant poses five questions for review, which we have reworded as follows: [1]

---

1. The appellant words his questions as follows:
 1. Was there sufficient evidence to convict Appellant?
 2. Did the trial court commit reversible error by prohibiting the impeachment of a key witness based on his prior conviction for failing to register as a sex offender; by applying a fifteen-year time limitation to Md. Rule 5–608 to prohibit the impeachment of a second key witness by a prior bad act that was probative of his credibility; or by prohibiting the impeachment of a third key witness based on a pending charge of fraud and identity theft, where the witness invoked his Fifth Amendment privilege only after making several affirmative statements denying those allegations?
 3. Did the trial court commit reversible error by failing to remedy the State's violation of Md. Rule 4–263 by not disclosing until shortly before and during trial the existence of, and information pertaining to, a key witness, including impeachment and other potentially exculpatory evidence, where the State had been in possession of that information and evidence for almost a year?
 4. Did the State commit reversible misconduct by attacking the character and integrity of Appellant's counsel, vouching for its own credibility, bolstering the credibility of a star witness, impeaching the

I. Was the evidence legally sufficient to support any of the convictions?

II. Did the trial court err by limiting the scope of impeachment of three State's witnesses?

III. Did the trial court err by denying the appellant's motion to preclude the testimony of Adrian Smith?

IV. Did the trial court err by allowing allegedly improper statements by the prosecutor during opening statement and closing argument?

V. Did the trial court err by failing to give certain jury instructions?

For the reasons that follow, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

In the early morning hours of November 25, 2004, Christopher Mader was found dead in the driver's seat of his silver 2001 Dodge Stratus, with a gunshot wound to the head. The Stratus had come to rest on the side of Smallwood Drive, in Waldorf, after crashing into electrical boxes. It was still running, was in drive, and its back windshield was shattered. Mader had been driving home from his job as a bartender at Bennigan's.

Police were called to the scene. They recovered from the Stratus a .40 caliber bullet on the floorboard, a coin bag with $59.46, and Mader's wallet, containing $1,080. The initial investigation into the shooting did not turn up any leads.

In March 2007, Kevin Smith, an inmate at the Brockbridge Correctional Institution and a self-described "jailhouse attorney," wrote a letter to the Charles County Sheriff's Office in

truthfulness of another of its witnesses, and misrepresenting evidence to the jury during its opening statement and rebuttal argument? 5. Did the trial court commit reversible error by failing to instruct the jury regarding impeachment by prior conviction of a witness, number of witnesses, and identification of defendant, at least in part due to a false assertion by the State?

which he claimed to know the identity of the person who had shot and killed Mader. In April 2007, Smith was questioned by Detective Keith Moody, and stated that the appellant, a fellow inmate at Brockbridge, had confessed to the murder. The police undertook an investigation, which included interviews of Shawn Myers and James Chaney, friends of the appellant. On October 22, 2010, the appellant was arrested and charged in connection with Mader's murder.

At trial, Kevin Smith testified for the State. He recounted that when they were inmates the appellant had come to him for advice because he was concerned that "a guy that he had committed murder with whom he referred to as James . . . was weak and . . . might go to the police." Over the course of four or five days, the appellant told Smith the details of the murder. According to Smith, the appellant explained that he and "James" had become aware of a "guy" who worked at Bennigan's who carried large amounts of money at the end of the night. They went to "the spot," watched the "guy" get into his car alone, and followed his car. James was driving and the appellant, who had a gun, was in the front passenger seat. They had planned to stage an accident—to tap the back of the "guy's" car so he would get out. Smith was unsure if that is what happened. As the appellant told him, the "guy's" car did come to a stop somewhere and James and the appellant pulled up alongside it. The appellant approached the "guy," and when the "guy" saw the gun, he sped off in his car. The appellant told Smith that he then "like panicked . . . and lost it and he shot the guy." The "guy's" car crashed into something, and the appellant "approached the car to go see if the guy had the money on him."

As the appellant further recounted to Smith, at that point, James panicked and drove off, leaving the appellant at the scene. The appellant ran behind him, but James would not stop. The appellant then ran behind a building. From there he could see people stopping where Mader's car had crashed. A few minutes later, police officers arrived. The appellant "started panicking" and buried the gun behind the building. He then walked along a "wooded type area" and eventually

caught a ride from a man to whom he gave "a couple of dollars." They went to a trailer park and the appellant got out.

Smith further testified that the appellant told him the victim's name was Chris Mader; that Mader's car was a silver or gray sports car; and that the events took place around Thanksgiving or Christmas.

The appellant mentioned to Smith that "a reward was out." That prompted Smith to write the letter to the Charles County Sheriff's Office. Smith testified that he came forward with information because he was interested in the reward, wanted help with the Parole Commission, and did not like the way the appellant had spoken about Mader's parents. Smith further testified that he had not received the reward and had not been promised anything for his testimony. He acknowledged that he had testified as a State's witness on one prior occasion—during a 2001 homicide case—and that afterward, a detective had written a letter to the Parole Commission on his behalf.

James Chaney also testified as a State's witness. He stated that on the afternoon of November 24, 2004, he went to a tattoo shop in Bel Alton that was run by his friend Shawn Myers, who also was friends with the appellant. The appellant was at the store. Chaney overheard Myers and the appellant planning a robbery to get money for the tattoo shop. He did not hear the details because he walked "right back out" of the shop. Chaney waited outside the shop for a couple of hours while Myers finished some tattoos. At some point the appellant left. When Myers was finished, he and Chaney drove to Bennigan's. Chaney did not remember whose car they took.

At Bennigan's, Myers talked to Mader, who was bartending. Chaney did not overhear the full conversation, but "heard something about money." Chaney had seen Mader at Bennigan's before. About two hours later, around 1:00 a.m. on November 25, Chaney went outside to smoke a cigarette. Myers joined him, and they both sat in the car smoking.

While Chaney and Myers were waiting in the parking lot, someone driving a pickup truck dropped the appellant off at Bennigan's. Chaney and Myers saw the appellant enter Bennigan's. About thirty minutes later, the appellant emerged and joined Chaney and Myers in the car. Five or ten minutes after that, Mader emerged, got in his car, and drove off.

With Myers driving, Chaney in the back seat, and the appellant in the front passenger seat, the three followed Mader's car. Once on Smallwood Drive, Myers cut Mader off and forced him to stop by pulling in front of him. The appellant got out of the car and Chaney and Myers remained inside. Thirty or forty seconds later, Chaney heard a gunshot. Myers and Chaney immediately drove off, leaving the appellant behind. Chaney did not see the appellant with a gun, and did not realize that a robbery was going to take place until he heard the gunshot.

Chaney admitted that he told the police "several" lies when he first spoke to them in 2010. The lies included that he had left Bennigan's before Myers did; that Myers had confessed to killing Mader; and that the appellant was not at Bennigan's on the night of the murder. Chaney explained that he had lied because Myers had threatened to kill him and his family, and he was afraid of retaliation. Chaney was not charged in connection with Mader's murder. The investigating officers told him they were not interested in him. Chaney understood that to mean he would not be charged if he cooperated with the State.

Shawn Myers testified for the State as well, offering a different account of the night of the murder.[2] According to Myers, he went to Bennigan's between 7:00 and 9:00 p.m. on November 24, 2004, after having Thanksgiving dinner with his family. He frequented Bennigan's about once a week and knew Mader as a bartender there. Myers did not recall speaking with Mader about money that evening. Around 2:00

---

2. Myers testified under the terms of a plea agreement with the State in which he would receive a suspended sentence for conspiracy to commit robbery in exchange for his testimony.

a.m. (on November 25), Myers called Chaney, who was not at the bar, to ask for a ride home. After Chaney arrived, the appellant approached Myers in the parking lot and asked for a ride. Myers had never met the appellant before, and told him he would have to ask Chaney, because it was Chaney's car. Chaney agreed, and the three left Bennigan's. Myers was driving, the appellant was in the front passenger seat, and Chaney was seated in the back. Myers testified that he did not think they were following anyone.

After they had been driving on Smallwood Drive for a few minutes, the appellant asked Myers to pull the car to the side of the road. Myers testified that the appellant seemed "agitated" and "irate." After Myers pulled the car over, the appellant got out and Chaney moved from the back seat to the front passenger seat. Thirty to forty-five seconds later, Myers "heard a sound like glass breaking" and Chaney said "let's get out of here." Myers then drove off.

Other witnesses for the State testified about the events of the night in question. Jason Lormore, a friend of Mader and a former bartender at Bennigan's, was at Bennigan's that night. In 2010, he was shown a photograph of the appellant and identified him as someone he frequently saw at Bennigan's and who was sitting at the bar on the night of the murder. Jamie Hyfantis, also a friend of Mader, was working as a cocktail waitress at Bennigan's that night. In 2011, she was shown a photograph of the appellant and identified him as a regular customer at Bennigan's who was there on the night of the murder. Two other bartenders who shared a shift with Mader that night testified that they saw Mader leave in his car around 2:30 a.m., and that there were other cars in the parking lot at the time.

Caesar Casiano, an off-duty detective who lived close to the scene of the crime testified that he was driving home around 2:50 a.m. on November 25, 2004, when he heard a gunshot followed by a crash. He drove around his neighborhood for a few minutes and spotted a car crashed on Smallwood Drive. Others, including one Jessica Scheyder, already had stopped

at the scene. Casiano and Scheyder each testified that they observed Mader slumped over the steering wheel of his car with a gunshot wound to the head.

Michael Cassidy was the appellant's friend and former neighbor in a trailer park in Waldorf. Cassidy testified that at 3:00 a.m. on November 25, 2004, he received a telephone call from the appellant, who said he was stranded and needed a ride. About a half hour later, Cassidy and his then girlfriend, Sharon Sams, picked up the appellant at a Mobil gas station on St. Patrick's Drive, and took him back to their house.[3] Sams also testified, corroborating Cassidy's story. According to Sams, the appellant was upset when they picked him up. He was complaining that he and his girlfriend had fought, and that she had kicked him out of their house.

Adrian Smith, Michael Cassidy's stepfather, also testified for the State. Adrian Smith and the appellant were housed in neighboring cells at the Charles County Detention Center. The two would speak through an air vent. According to Smith, the appellant told him he shot someone during an attempted robbery. The appellant gave him two different versions of the events. In the first, the appellant and "his girl" were "looking for some pills." He dropped her off somewhere, picked up someone else, and then went somewhere and "a[n] altercation happened," after which "the people that he was with left him." In the second, the appellant and some others "went to rob somebody," and an "altercation happened and they left him at the spot and he had to call [Cassidy] to come and pick him up." Smith testified that, in both versions of the story, three people were involved in the robbery; the appellant "was the person that got out of the car and went to the person"; the appellant was the one who "shot" the person; and the appellant called Cassidy to pick him up. Smith testified that, at some point, the appellant also "mentioned Bennigan's" and asked him to urge Cassidy "not

---

**3.** Aerial photographs admitted into evidence show that the Mobil gas station was located on Smallwood Drive, some distance along the same road as the murder scene.

to come to court" to testify, or to limit his testimony. Smith also testified that the appellant said: "[S]hot I did, two in the head, brain matter in the left. . . . I beat the charge, got a stet dock." [4] On July 12, 2011, Smith informed the Charles County Sheriff's Office about what the appellant had told him.

After Adrian Smith's testimony, the State played a recording of a jailhouse telephone call placed by the appellant to an unidentified female on May 15, 2011. In the call, the appellant mentions speaking with Adrian Smith through the vent and says that Smith told him that Cassidy was "running around" telling people he was "State's evidence," and "would talk to the lawyer or investigator."

When the State rested its case-in-chief, the appellant moved for judgment of acquittal on all counts. The court denied the motion. The appellant did not call any witnesses or produce any evidence. He renewed his motion for judgment of acquittal, which was again denied.

The jury deliberated for approximately an hour and a half and returned verdicts of guilty on all counts.

We shall include additional facts as necessary to our discussion.

## DISCUSSION

### I.

### *Sufficiency of the Evidence*

The appellant contends the evidence was legally insufficient to sustain any of his convictions. He offers a number of reasons: the testimony of Chaney and Myers was inherently unreliable because they were accomplices, had "ample reason to lie," and gave accounts that were inconsistent; because Chaney and Myers were accomplices, their testimony required adequate corroboration by other evidence, and there was not

---

4. The charges against the appellant had been placed on the stet docket but were removed on September 2, 2011.

adequate corroborating evidence, so their testimony should not have been considered; the corroborating evidence that existed was unreliable; the testimony of Kevin Smith and Adrian Smith was "inherently problematic" because they were "jailhouse informants" who were motivated by self-interest; the identifications by Lormore and Hyfantis placing him at Bennigan's on the night of the murder took place too long after the night in question to be reliable; the testimony of Cassidy and Sams about picking him up in the early morning hours after the murder was inadequate to place him in the vicinity of the crime or in the company of the perpetrators; and there was no evidence showing that he ever was in possession of a weapon, or that a handgun was used in the shooting.

The State responds that the appellant failed to preserve two of his sufficiency arguments: that there was legally insufficient evidence of corroboration of the testimony of Chaney and Myers, and that there was legally insufficient evidence to sustain the handgun charge. The State further responds that, even if the appellant's arguments were preserved, the evidence was legally sufficient to support all of his convictions.

In assessing the legal sufficiency of the evidence to support a criminal conviction we view the evidence in the light most favorable to the verdict and determine whether, on that evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

### 1. *Corroboration of Accomplice Testimony.*

■■■■ Ordinarily, a non-jurisdictional issue is not preserved for appellate review if it was not raised in or decided by the lower court. Md. Rule 8–131(a); *see, e.g., McDonald v. State,* 141 Md.App. 371, 376, 785 A.2d 836 (2001). Moreover, we only will review a question of legal sufficiency of the evidence " 'for the reasons given by [the defendant] in his motion for judgment of acquittal.' " *Taylor v. State,* 175 Md.App. 153, 159, 926

A.2d 805 (2007) (quoting *Whiting v. State,* 160 Md.App. 285, 308, 863 A.2d 1017 (2004)). Under Rule 4–324(a), a defendant who moves for judgment of acquittal must "state with particularity all reasons why the motion should be granted." When a defendant only argues a generality, he does not preserve for review more particularized insufficiency arguments that could have been made but were not. *Taylor,* 175 Md.App. at 159–60, 926 A.2d 805.

Here, at the close of the State's case-in-chief, defense counsel moved for judgment of acquittal on all counts asserting that the evidence was legally insufficient to prove the elements of the crimes beyond a reasonable doubt. On the first degree murder count, counsel argued that the State had failed to "prove a prima facie case" because the State's witnesses "disavowed any knowledge or awareness of the purpose for which they contend [the appellant] committed this offense" and their testimony "ha[s] been so directly at odds." On the armed robbery count, counsel argued that there was no evidence to show agreement, attempt, or premeditation to commit robbery. On the handgun count, counsel asserted that

> [the State has] not proven necessarily that the . . . firearm in this case was a handgun. They have provided evidence that would permit one to conclude among the possibilities that it could have been, but . . . there was no handgun recovered. And, therefore, we would submit that the evidence is insufficient on that basis to send the matter to the jury.

As to all counts, defense counsel argued that "just generally, . . . the State . . . has failed to make out a prima facie case as to each and every element . . . as to each and every offense." In his renewed motion for judgment of acquittal at the close of all the evidence, defense counsel "adopt[ed] and incorporat[ed] the arguments made at the end of the State's case."

The record reflects that the appellant did not assert in support of his motion for judgment of acquittal that Myers and Chaney were accomplices and that evidence to corroborate their testimony was lacking and that, without their testi-

mony, the evidence was legally insufficient to convict. Indeed, the approach the appellant took was completely the contrary. He asked the court to give the B version of Maryland Criminal Pattern Jury Instruction [MPJI–Cr] 3:11 on the evidentiary value of the testimony of an accomplice. Under that instruction, the jurors first decide whether a particular witness was an accomplice at all, and then, if the witness has been found to be an accomplice, decide whether the accomplice's testimony was corroborated.[5] Thus, the accomplice corroboration facet of the appellant's sufficiency argument not only is unpreserved, it was waived.

■ Even if the accomplice testimony argument were preserved and were not waived, it lacks merit. The jurors reasonably could have found that neither Myers nor Chaney were accomplices. And, if the jurors found that they (or either of them) were accomplices, their testimony was sufficiently corroborated by other evidence adduced at trial.

Not much in the way of evidence corroborative of the accomplice's testimony has been required by our cases. We

---

5. The jury instruction on this point was as follows:

> You have heard testimony from two people who may be … may have been … may be considered accomplices to the crimes charged here. An accomplice is someone who knowingly and voluntarily cooperated with, aided, advised, or encouraged another person in the commission of a crime. If you're not convinced that someone was indeed an accomplice, then you should treat his testimony … as you would treat the testimony of any other witness. On the other hand, if you are convinced that the individual was an accomplice, you must decide whether that testimony was corroborated before you may really give it full effect or consider it as you would other peoples' testimony. The rule is that someone cannot be convicted of crimes solely on the uncorroborated testimony of an accomplice. On the other hand, only slight corroboration is required. This means there must be some evidence in addition to the accomplice testimony that tends to show either: (1) that the Defendant committed the crime; or (2) that the Defendant was with others who committed the crime at the time and in the place where the crime [ ] occurred.
>
> If you believe the testimony of an accomplice has been corroborated, it should be considered with caution and given such weight as you believe it deserves. If you find that somebody was an accomplice, but that his testimony has not been corroborated, you must disregard it and may not consider it as evidence against the Defendant.

have, however, consistently held the view that while the corroborative evidence need not be sufficient in itself to convict, it must relate to material facts tending either (1) to identify the accused with the perpetrators of the crime or (2) to show the participation of the accused in the crime itself. If with some degree of cogency the corroborative evidence tends to establish either of these matters, the trier of fact may credit the accomplice's testimony even with respect to matters as to which no corroboration was adduced.

*Woods v. State*, 315 Md. 591, 616–17, 556 A.2d 236 (1989) (quoting *Brown v. State*, 281 Md. 241, 244, 378 A.2d 1104 (1977)).

Kevin Smith testified that the appellant gave a detailed account of his involvement in Mader's murder, including that he and another man planned a robbery, and trailed Mader after he left Bennigan's, that he approached Mader's car with a gun after it stopped, and that he shot Mader after Mader tried to flee. Adrian Smith testified that the appellant confessed to approaching a person in a car and shooting him in the course of a planned robbery that went awry. Lormore and Hyfantis identified the appellant as having been present at Bennigan's on the night of the murder. Cassidy and Sams testified that they picked up the appellant in the vicinity of the crime scene within a few hours after the shooting. All of this, among other evidence, tended to corroborate the firsthand accounts of Myers and Chaney.

## 2. *The Handgun Charges.*

With regard to the handgun charges, we disagree with the State that the issue of the legal sufficiency of the evidence to support convictions of those charges was not preserved. The record reveals that defense counsel made a particularized argument about the sufficiency of the evidence to support those charges (a handgun was merely "among the possibilities," and "there was no handgun recovered").

The appellant argues that the trial court should have granted his motion for judgment of acquittal on the handgun charges because there was no evidence that he was ever in possession of a weapon, or that a handgun was used in the shooting. He is incorrect.

■ Md.Code (2002, 2012 Repl.Vol.), section 4–201(c) of the Criminal Law Article defines a handgun as "a pistol, revolver, or other firearm capable of being concealed on the person." A "weapon's identity as a handgun can be established by testimony or by inference," as opposed to "tangible evidence in the form of the weapon." *Wilder v. State*, 191 Md.App. 319, 338, 991 A.2d 172 (2010).

Kevin Smith testified that the appellant told him that he was carrying a gun, approached Mader's car with the gun in hand, shot Mader, and buried the gun behind a building. Adrian Smith testified that the appellant told him—in both versions of the story—that he was the one who got out of the car, approached "the person," and shot him. Chaney claimed that he heard a gunshot thirty to forty seconds after the appellant exited the car. Based upon this evidence, rational jurors could have found beyond a reasonable doubt that the appellant possessed and used a firearm. Moreover, the jurors reasonably could have concluded that the firearm was a handgun for the same reason the trial judge gave in denying the motion for judgment of acquittal on the handgun charges: the parties had entered into a stipulation, which was admitted into evidence, that the bullet retrieved from Mader's car could have been discharged from two specific types of pistols, among others. In addition, the fact that no one saw the appellant holding a gun at a time when he must have been in possession of a gun supported a reasonable inference that the appellant was in possession of a gun that was capable of being concealed.

### 3. *Other Sufficiency Arguments.*

■ None of the arguments the appellant advanced regarding sufficiency have any merit either. They all amount to

nothing more than taking issue with the weight and credibility determinations made by the jury. It is "the jury's task to resolve any conflicts in the evidence and assess the credibility of witnesses." *Allen v. State*, 158 Md.App. 194, 251, 857 A.2d 101 (2004). In so doing, the jury "can accept all, some, or none of the testimony of a particular witness." *Id.* It is not a proper sufficiency argument to maintain that the jurors should have placed less weight on the testimony of certain witnesses or should have disbelieved certain witnesses. Here, the jurors were presented with evidence that, if credited, was legally sufficient to support a finding of each element of each crime charged, beyond a reasonable doubt.

## II.

### *The Scope of Cross–Examination*

The appellant contends the trial court erred by prohibiting him from using evidence of prior convictions and bad acts to impeach witnesses Shawn Myers, Kevin Smith, and Adrian Smith. He maintains that these errors were not harmless, and require reversal.

"The scope of cross-examination lies within the sound discretion of the trial court." *Pantazes v. State*, 376 Md. 661, 681, 831 A.2d 432 (2003). We therefore review the trial court's decisions for abuse of discretion. *Id.* "Whether there has been an abuse of discretion depends on the particular circumstances of each individual case." *Id.* For the reasons that follow, we hold that the trial court did not abuse its discretion in limiting the scope of impeachment questioning during cross-examination.

### 1. *Impeachment of Shawn Myers.*

At trial, defense counsel sought permission of the court to impeach Myers with a prior conviction for failing to register as a sex offender. The following colloquy ensued:

[PROSECUTOR]: I don't see how that's impeachable.

THE COURT: I don't see that is [sic], involves the kind of moral turpitude with which we are concerned here.

\* \* \*

THE COURT: No, I don't think you should, no, I'm not going to allow you to go into that.

[DEFENSE ATTORNEY]: All right, I'm barred from asking is he's . . .

THE COURT: Not just because you have enough other stuff but, but I don't think that's impeachable material as such. I really don't.

The trial judge also prohibited defense counsel from eliciting the fact that Myers was on the registry, explaining "you've got enough dirt without that on this guy." The judge acknowledged that defense counsel already had mentioned that information in opening statement.

Subsection (a) of Rule 5–609 provides, in relevant part, that a witness's credibility may be attacked with evidence that the witness has been convicted of a crime, "but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or the objecting party." Also, subsection (b) of that rule states that "[e]vidence of a conviction is not admissible . . . if a period of more than 15 years has elapsed since the date of the conviction."

 Thus, under Rule 5–609, "the universe of convictions that can be used to impeach a witness's credibility, is limited to 'infamous crimes' (common law felonies and the common law *crimen falsi* ) and crimes that are relevant to the witness' credibility." *Washington v. State,* 191 Md.App. 48, 82, 990 A.2d 549 (2010) (internal citation omitted) (citing *State v. Westpoint,* 404 Md. 455, 478, 947 A.2d 519 (2008)). "Infamous crimes include treason, common law felonies, and other offenses classified generally as *crimen falsi.*" *State v. Giddens,* 335 Md. 205, 213, 642 A.2d 870 (1994). *Crimen falsi* include "crimes in the nature of perjury, false statement, criminal fraud, embezzlement, false pretense, or any other offense

**504**

involving some element of deceitfulness, *untruthfulness*, or falsification bearing on the witness's propensity to testify truthfully." *Id.* at 213 n. 5, 642 A.2d 870.

⬛⬛⬛ The appellant does not argue that the crime of failure to register as a sex offender is an "infamous crime." He argues that the crime shows a lack of trustworthiness, and therefore bears on credibility. Whether a crime "bears upon credibility is a matter of law." *State v. Giddens, supra,* at 213, 642 A.2d 870. In determining whether a crime bears upon credibility, we look to the elements of the crime itself. In *Westpoint,* 404 Md. at 484, 947 A.2d 519, the Court of Appeals explained:

> [I]n order for a crime to be admissible for impeachment, the crime itself, by its elements, must clearly identify the prior conduct of the witness that tends to show he is unworthy of belief. Moreover, a crime tends to show that the offender is unworthy of belief if the perpetrator lives a life of secrecy and engages in dissembling in the course of [the crime], being prepared to say whatever is required by the demands of the moment, whether the truth or a lie.

(Alteration in original; internal citations and quotation marks omitted.)

Md.Code (2001, 2008 Repl.Vol., 2013 Supp.), section 11–721 of the Criminal Procedure Article provides, in relevant part:

> *Prohibited act.*—A registrant may not knowingly fail to register, knowingly fail to provide the notice required under § 11–705 of this subtitle, knowingly fail to provide any information required to be included in a registration statement described in § 11–706 of this subtitle, or knowingly provide false information of a material fact as required by this subtitle.[6]

Thus, to be guilty of the crime of failing to register, a registrant, *i.e.,* a person who is required to register as a sex offender, must knowingly fail to do so. "Knowingly" means

---

6. This most recent version of the Code is slightly altered but not substantially different from that in effect during the appellant's trial.

that the registrant acts with knowledge, *i.e.*, that he knows that he must register as a sex offender but does not do so.

No Maryland case has addressed whether a conviction for failure to register as a sex offender is a crime that tends to show the witness is unworthy of belief.[7] The appellant relies upon *Tristan v. State*, 393 S.W.3d 806 (Tex.App.2012), in which the defendant was convicted of indecent exposure. At trial, the defendant testified on his own behalf. The prosecu-

---

7. In *Washington v. State, supra,* we considered whether the trial court had abused its discretion in not allowing the defense to cross-examine a State's witness about his failure to register as a sex offender, as a prior bad act under Rule 5–608(b) (there was no conviction of the crime). The witness had been convicted of a sexual crime in South Carolina in 1995. He began working in Maryland in 2007, about three weeks before the defendant committed the crime at issue. Upon beginning employment in Maryland, the witness was required to register as a sex offender; he had not done so, however. At trial, the court precluded the defense from eliciting on cross-examination of the witness that he had not registered as a sex offender in Maryland during the three weeks he had been living in this State, before the crime was committed.

On appeal after conviction, we held that the trial court had not abused its discretion by precluding this line of inquiry given that the court had "permitted cross-examination on other matters that impeached [the defendant's] credibility," and the court generally has "wide latitude" in determining the scope of cross-examination. *Washington*, 191 Md.App. at 84–85, 990 A.2d 549. We emphasized that even if the impeachment evidence in question otherwise was admissible, the trial court had to exercise its discretion to assess whether the probative value of the evidence outweighed its prejudicial effect, and the trial court had done so, concluding that the prejudicial effect of letting the jurors know the witness was a sex offender outweighed the probative value, as impeachment evidence, of his not having registered as a sex offender after a mere three weeks in Maryland. We cited with approval *United States v. Easter*, 66 F.3d 1018 (9th Cir.1995), in which the Ninth Circuit Court of Appeals concluded that the trial court did not abuse its discretion in prohibiting the defense from cross-examining a government witness about his failure to register as a sex offender. The defendant had argued on appeal that the witness's failure to register was relevant because he could have been motivated to testify for the government by a desire to avoid being prosecuted for that failure. The Ninth Circuit reasoned that the trial court properly exercised its discretion in deciding that the probative value of the impeachment evidence was minimal, as there was evidence that the witness had sought the government's assistance with a pending violation of probation case, and therefore was motivated to testify for the government for that reason, and the prejudicial effect of disclosing that the witness was a sex offender was high.

tor sought to impeach him with a prior conviction for failure to register as a sex offender. The trial court permitted the impeachment. On appeal after conviction the defendant argued that the prior conviction for failure to register as a sex offender did not bear on his character for truthfulness, and therefore the court had erred in allowing the impeachment. The Texas rule on use of prior convictions for impeachment is virtually identical to Rule 5–609.

The Texas intermediate appellate court disagreed with the defendant, and affirmed his conviction. The court explained:

> To register as a sex offender, a defendant must disclose statutorily required information and tender it to law enforcement. A person required to register may not fail to provide the information required for an accurate registration. The goal of registration and notification provisions is to facilitate law enforcement's monitoring of sex offenders and to alert the public, so that those who may be vulnerable to crime may take appropriate precautions that could deter further crimes. The information gathered from the registry process is public information. A convicted sex offender may want to conceal the required information for a number of reasons, including evading tracking by law enforcement and detection by the public. We hold that failure to register as a sex offender can be a crime of deception that bears on the witness's character for truthfulness.

*Tristan, supra,* at 812 (footnote and citations omitted).

We disagree with the conclusion of the *Tristan* court. As noted, in Maryland, the test for whether a crime is admissible for impeachment is whether the elements of the crime clearly identify conduct showing that the convicted person is unworthy of belief, that is that the "perpetrator lives a life of secrecy and engages in dissembling in the course of [the crime], being prepared to say whatever is required by the demands of the moment, whether the truth or a lie." *Westpoint, supra,* at 484, 947 A.2d 519. The elements of the crime of failing to register do not include an intent to deceive. A sex offender can knowingly fail to register, thus committing the crime, for

reasons that are not deceptive. It is not enough that a sex offender "can" knowingly fail to register with an intent to deceive, as the *Tristan* court held. For this reason, we agree with the trial court that failure to register as a sex offender is not an impeachable offense under Rule 5–609(a).

The appellant asserts that the trial court failed to exercise discretion in ruling the impeachment inadmissible, and that failure to exercise discretion is itself an abuse of discretion. If the offense cannot be used to impeach, under Rule 5–609(a), the court does not proceed to the next step of weighing the probative value of the impeachment evidence against its potential for unfair prejudice; so the court was not required to exercise discretion in that regard. In any event, the court exercised discretion, despite its conclusion that the failure to register conviction was not an impeachable offense, by reasoning that the appellant had "enough other stuff" with which to impeach Myers. That "other stuff" included convictions for theft in 2010 and conspiracy to commit robbery in 2008, and Myers's plea agreement with the State in the present case. In these circumstances, we are of the view that, even if a conviction for failure to register as a sex offender is an impeachable offense, which, as explained, we conclude it is not, the trial court properly exercised discretion in ruling that additional impeachment with a conviction for failure to register as a sex offender was not necessary.

## 2. *Impeachment of Adrian Smith.*

In 1992, Adrian Smith was charged with making a false statement to a police officer. He was not convicted, however. At trial, the appellant sought, unsuccessfully, to cross-examine Smith about that charge, pursuant to Rule 5–608(b). That rule provides that the court may permit a witness to be impeached by examination regarding his or her prior conduct that did not result in a conviction, but that the court finds probative of a character trait of untruthfulness. Unlike the 15–year time limitation imposed by Rule 5–609(b), there is no time limitation for prior bad acts that may be used for impeachment under Rule 5–608.

After defense counsel sought permission to impeach Adrian Smith with the 1992 charge, the court responded, "Okay, if [Smith's 1992 charge] were less than fifteen years old . . . . I'd let you go into it but since it's not less than fifteen years old I'm going to say no." The trial judge previously had explained that " . . . I wasn't going to let [defense counsel] go into anything that was, even if it bore on credibility . . . more than fifteen years old," and reasoned that,

> if [we] were to read the two rules, [Md. Rule 5–]608 and [5–]609 . . . in paring material [sic], wouldn't it be reasonable to conclude that generally speaking unless there's something extraordinary involved that the prior bad act whether it resulted in conviction or not probably shouldn't come into evidence . . . if it's more than 15 years old.

Defense counsel replied, "I don't think you read them that way. I think you read them separately." The judge then said,

> But wouldn't the same kind of factors that go into probative value versus the contrary be involved in the kind of balancing act the Court goes through under 5–608(b) as it goes into in 5–609 which talks about convictions as such. The same kind of balancing act basically.

> \* \* \*

> . . . I don't believe that [Rule 5–]608 would allow you to go . . . into conduct for which he was not convicted if it's more than fifteen years old, . . . if you were prohibited [by Rule 5–609] from going into stuff for which somebody was convicted. . . .

The appellant argues that the trial judge made an error of law by importing the time limitation of Rule 5–609(b) into Rule 5–608, and that the court "abused its discretion by refusing, based on its incorrect interpretation of Rule 5–608, to even consider admitting the prior charge against Smith regardless of how probative it was of his credibility."

The record makes clear that the trial judge was not operating under a mistaken legal belief that Rule 5–608, like 5–609(b), contains an explicit time limitation. Rather, he was

referencing the time limitation in 5–609 as a "factor" in his assessment of the probative value of the 1992 charge against Smith. As he reasoned, if a conviction that is older than fifteen years cannot be used as evidence that impeaches a witness's credibility, then a mere charge, not resulting in a conviction, that is older than fifteen years likely is not probative either, unless it is "something extraordinary." Although Rule 5–608 does not require the court to undertake the "probative versus prejudice" determination required by 5–609(a), it permits impeachment by prior conduct only if the court finds the conduct "probative of a character trait of untruthfulness." It was well within the trial judge's wide discretion here to conclude that a twenty year old charge that did not result in a conviction was not probative of Smith's character for truthfulness, and to consider related evidentiary rules in making his determination.

### 3. *Impeachment of Kevin Smith.*

 Before the trial began, defense counsel alerted the court that he had just been provided a copy of a federal indictment against Kevin Smith—charging him with a $400,000 identity theft—and that he intended to question Smith about the charge "as prior bad acts affecting credibility among other things." Defense counsel explained that he "wanted to make sure Mr. Smith is not going to get half way through his testimony and then start asserting a Fifth Amendment Right not to have to answer those questions and therefore make him unavailable for effective cross-examination." Subsequently, during trial, the court held a conference with counsel and Smith outside of the jury's presence to discuss the issue. When asked by defense counsel if he would answer questions related to the federal charge or would instead invoke his Fifth Amendment privilege, Smith responded that he would "take the Fifth Amendment as to anything regarding" the charges.

Before Smith testified, the prosecutor asked the court for clarification as to whether Smith was going to be allowed to invoke the Fifth Amendment in front of the jury. Defense

counsel argued, "I'm entitled to have him take the Fifth in front of the jury," and explained during a subsequent colloquy that "[i]f [Smith] takes the Fifth the jury can legitimately draw an adverse inference ... and therefore they could consider that as they evaluate his credibility." The court agreed to allow defense counsel to "ask a couple of relevant questions regarding the behavior [alleged in the federal indictment] ... put on the show of having the witness invoke the Fifth and then we [will] call it time out. So, the answer is you can have the invocation occur in the presence of the jury."

On cross-examination, defense counsel asked Smith if he had "been indicted in the United State's [sic] District Court on a fraud and identity theft charge." Smith responded, "yes." Defense counsel went on to ask, over the State's objection, whether Smith was aware that the indictment "alleges that you set up false companies .... [s]o that you could file unemployment insurance claims to get, fraudulently [sic] benefits and monies sent back to you part of which you could use while you were in jail," to which Smith again answered "yes." Smith answered "no" when asked, "Did you do it?" Defense counsel attempted to further question Smith about the substance of the charges, but the prosecutor objected, asserting "Your Honor, he has a Fifth Amendment privilege, he can't go into this." The judge replied that "it's up to him to invoke that privilege." Thereafter, Smith invoked his Fifth Amendment privilege in answer to additional questions about the federal charges.

After the close of the State's case-in-chief, defense counsel asked the court to strike the entirety of Kevin Smith's testimony

> based upon the fact that he exercised his 5th Amendment right, and made himself unavailable to be fully cross-examined, thus depriving [the appellant] of his opportunity to effectively cross-examine him, consistent with his rights under the due process clause of the 6th Amendment, and any equivalent Maryland provisions.

The judge denied the motion. At the conclusion of the trial, pursuant to defense counsel's earlier request, the jurors were instructed that they could "draw an adverse inference from Mr. Smith's invocation of his privilege" against self-incrimination.

The appellant argues that the trial court erred in allowing Kevin Smith to invoke his Fifth Amendment privilege. He maintains he "was unjustly barred from fully presenting impeachment evidence as to Kevin Smith." The State counters that this argument is not preserved for review because it was never raised during the trial; indeed, it was defense counsel who urged the court to allow Smith to invoke the privilege in front of the jury. We agree.

The record makes clear that all parties were aware that Smith likely would invoke his Fifth Amendment privilege against self-incrimination if cross-examined about the federal indictment. When the issue was initially discussed among the court and the parties, the only question of prejudice was with regard to the State, *i.e.*, whether Smith's invocation would generate a jury instruction informing jurors that they could draw an adverse inference against him. It appears that the appellant received everything he requested in the matter: the opportunity to question Smith about the federal indictment (including that it involved charges of fraud and identity theft, and fraudulent unemployment insurance claims), and Smith's invocation of the Fifth Amendment, which generated the adverse inference jury instruction. The appellant cannot argue that the trial court should not have made a ruling that was precisely the ruling he requested at trial.

## III.

### *Discovery Violation By The State*

The appellant contends the trial court abused its discretion by denying his motion to preclude the testimony of Adrian Smith as a sanction against the State for not timely producing discovery materials relating to Smith. Specifically, the appellant argues that the State's untimely disclosure of its

intention to call Smith as a witness, and its eleventh hour production of accompanying materials—including investigative reports and over 3,000 telephone recordings involving Smith or the appellant—required the court to impose the sanction of barring Smith from testifying.

When there is a violation of a discovery obligation in a criminal case, "[t]he decision as to which remedy or sanction to impose generally rests within the broad discretion of the trial court." *Williams v. State*, 416 Md. 670, 698, 7 A.3d 1038 (2010). This discretion extends to deciding whether to grant or deny a motion to disqualify a witness from testifying based upon a party's failure to comply with discovery obligations. *See* Md. Rule 4–263(n) ("If a motion is filed to disqualify the witness's testimony, disqualification is within the discretion of the [trial] court."). For the following reasons, we conclude that the trial judge's decision to deny the appellant's motion to bar Smith from testifying was not an abuse of discretion.

During a pretrial hearing on June 18, 2012, defense counsel informed the court that he had just received information related to the State's intention to call Adrian Smith as a witness "within the last . . . three to four weeks," and that the "investigative materials, the tapes and everything that relate to him" had been around since December 2011. Defense counsel stated that after reviewing the materials, he might request the court to bar Smith's testimony.

On June 25, 2012—the first day of trial—defense counsel filed a motion *in limine* to preclude Smith's testimony based upon the State's untimely production. Defense counsel averred that on May 30, 2012, the State produced supplemental discovery in which it suggested that it might seek to call Adrian Smith as a witness, and provided investigative reports summarizing Smith's anticipated testimony and summaries of certain jail calls involving Smith, as well as summaries of certain jail calls involving the appellant. The actual recordings of the telephone calls and interviews with Smith were sent to defense counsel around June 14, 2012, and on June 18,

2012, the State identified which recordings it would seek to introduce at trial.

The court heard the motion after jury selection but before opening statements. The prosecutor acknowledged that the State's discovery relating to Smith had been untimely due to an "oversight," but argued that there was no bad faith, and the remedy of excluding Smith's testimony would be extreme. Instead, a continuance would be more appropriate and would relieve any prejudice. Moreover, the prosecutor explained, there likely was no prejudice at all because Smith was known to the defense well before the State disclosed that it would call him as a witness. Indeed, Smith became known to the State only when defense counsel provided his name as a possible alibi witness, in June 2011, before the first scheduled trial date.[8] In addition, the prosecutor represented that the State was not going to use any recordings of Smith's telephone calls in its case-in-chief. The court reserved ruling on the motion, but ordered the State to provide Smith's police reports and mental health records by the following morning; defense counsel identified these materials as those he would have sought had he known earlier about Smith's testimony.

The court revisited the motion on the third day of trial, before Adrian Smith testified. Defense counsel acknowledged that the State had complied with the court's order, providing him with "the specific items that I have identified" and, as a result, "some of the prejudice has been ameliorated." Nonetheless, defense counsel still sought to bar Smith's testimony. The court denied the motion, giving the following reasons: there was no evidence that the State's tardiness was due to bad faith; the defense had "been on notice" about Adrian Smith for more than a year, and should not have been surprised that the State talked to him; since the end of May 2012, the State had "gone to great lengths and apparently pulled out the stops" to provide the defense with the relevant materials; the State was not going to use the recordings of

---

8. A July 2011 trial date was postponed when the case briefly was placed on the stet docket.

Smith's telephone calls; ultimately, there was no undue preju-
dice; and the defense sought the "nuclear option" of excluding
Smith's testimony, instead of requesting other available relief.

The court's ruling reflects an appropriate exercise of discre-
tion. *See Thomas v. State*, 397 Md. 557, 570–71, 919 A.2d 49
(2007) ("In exercising its discretion regarding sanctions for
discovery violations, a trial court should consider: (1) the
reasons why the disclosure was not made; (2) the existence
and amount of any prejudice to the opposing party; (3) the
feasibility of curing any prejudice with a continuance; and (4)
any other relevant circumstances." (footnote omitted)). Par-
ticularly salient is the court's finding that the State acted in
good faith and made timely efforts to produce documents that
largely ameliorated any prejudice to the defense, that the
defense could have taken steps earlier to investigate Smith on
its own, and the defense had only requested the most extreme
remedy available. *See id.* at 571, 919 A.2d 49 ("The most
accepted view of discovery sanctions is that in fashioning a
sanction, the court should impose the least severe sanction
that is consistent with the purpose of the discovery rules.").

## IV.

### Remarks by Prosecutor in Opening Statement and Closing Argument

 The appellant contends he was prejudiced by improp-
er remarks by the prosecutor in opening statement and clos-
ing argument. Specifically, the appellant maintains that the
prosecutor improperly attacked the credibility and character
of defense counsel, vouched for the credibility of certain
State's witnesses, bolstered the testimony of a key State's
witness, impeached the truthfulness of a witness whose testi-
mony was damaging to the State's case, and misrepresented
the evidence to the jury.

The State counters that the appellant's contentions are not
preserved for review because he did not object to any of the
allegedly improper remarks. We agree.

The appellant acknowledges that he made no objections. He reasons, however, that under *Curry v. State,* 54 Md.App. 250, 458 A.2d 474 (1983), he was not required to object because a contemporaneous objection could " 'underscore the prosecutor's comments and perhaps add greater impact to those remarks,' and presents the risk that the objection will be overruled, thus 'emphasizing to the jury the correctness of the comments.' " (Alterations omitted); (quoting 54 Md.App. at 256, 458 A.2d 474 (1983).) In *Curry,* this Court held that it was sufficient for preservation purposes that defense counsel objected to the prosecutor's allegedly improper remarks immediately after the prosecutor completed his argument. *See Curry, supra,* at 256, 458 A.2d 474 (noting that it is preferable for an objection to be lodged at the time the improper comment is made, but acknowledging the strategic reasons for waiting to object until the close of argument). *See also Height v. State,* 185 Md.App. 317, 337, 970 A.2d 921 (2009), *vacated on other grounds,* 411 Md. 662, 984 A.2d 871 (2009) ("We shall continue to hold that objections to improper argument are timely if interposed either (1) immediately after the allegedly improper comments are made, or (2) immediately after the argument is completed.").

Here, defense counsel failed to object to the allegedly improper comments at any time. Accordingly, there is no ruling of the court to review. *See e.g. Bates v. State,* 127 Md.App. 678, 703, 736 A.2d 407 (1999), *overruled on other grounds, Tate v. State,* 176 Md.App. 365, 933 A.2d 447 (2007) (argument about prosecutor's improper comments not preserved for appellate review when "counsel neither objected when the argument was made nor at any later point [and] did not request a mistrial or a curative instruction").

## V.

### *Jury Instructions*

 Finally, the appellant contends the trial court erred by declining to give three jury instructions he requested: "Impeachment by Prior Conviction (Witness)" (MPJI–Cr

3:22(B)); "Number of Witnesses" (MPJI–Cr 3:16); and "Identification of Defendant" (MPJI–Cr.3:30). He argues that the court's refusal to give the requested instruction on impeachment by prior conviction was particularly egregious, because the prosecutor mistakenly told the judge that the instruction had been given after the judge expressed doubt.

The State responds that the appellant's arguments are not preserved for review because the appellant did not object to the jury instructions after they were given. We agree. Rule 4–325(e) states that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." At no time did defense counsel voice an objection to the jury instructions after they were given. Accordingly, the appellant's arguments about the omitted jury instructions are not preserved for our review.

■■■ The appellant nonetheless asks us to review the court's failure to give the requested jury instructions for "plain error," as permitted by Rule 4–325(e) ("An appellate court, on its own initiative or on the suggestion of a party, may … take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object."). We recently reaffirmed that " 'appellate review under the plain error doctrine 1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon.' " *Robinson v. State*, 209 Md.App. 174, 203, 58 A.3d 514 (2012), *cert. denied*, 431 Md. 221, 64 A.3d 497 (2013) (alteration omitted) (quoting *Kelly v. State*, 195 Md.App. 403, 431–32, 6 A.3d 396 (2010)). This is so because

> both fairness and judicial efficiency ordinarily require that all challenges that a party desires to make to a trial court's ruling, action, or conduct be presented in the first instance to the trial court so that (1) a proper record can be made with respect to the challenge, and (2) the other parties and the trial judge are given an opportunity to consider and respond to the challenge.

*Id.* at 202, 58 A.3d 514. Accordingly, we will review an unpreserved error under the plain error doctrine "only when the unobjected to error is compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial." *Id.* at 203, 58 A.3d 514 (alteration and internal quotation marks omitted). The complained-of omissions in the jury instructions do not meet that high threshold.

**JUDGMENTS OF THE CIRCUIT COURT FOR CHARLES COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**